No. 88-052

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

IN RE THE MATTER OF:
J.W. AND J.C., Youths
in Need of Care,

---

APPEAL FROM:   District Court of the First Judicial District
               In and for the County of Lewis and Clark
               The Honorable Henry Loble, Judge presiding

COUNSEL OF RECORD:

   For Appellant:

      Edmund F. Sheehy, Jr.; Cannon and Sheehy, Helena, MT

   For Respondent:

      Honorable Mike Greely, Attorney General, Helena, MT
      Paul D. Johnson, Assistant Attorney General
      Nicholas Jacques, Helena, MT
      Mike McGrath, County Attorney, Helena, MT
      Carolyn Clemens, Deputy County Attorney

---

                        Submitted on Briefs:   April 21, 1988

                            Decided:   May 9, 1988

Filed: MAY 9 - 1988

_Ethel M. Harrison_
_____
                    Clerk

Mr. Justice John C. Harrison delivered the Opinion of the Court.

This is an appeal from the First Judicial District, Lewis and Clark County, State of Montana, the Honorable Henry Loble presiding. The appeal is from an action which arose when the Lewis and Clerk County Office of Human Services (Office of Human Services) received referrals in December 1984 and February 1985 concerning J.C. and J.W., the natural children of B.W. (hereinafter referred to as mother). After mother was hospitalized for psychiatric care in May of 1985, a petition was filed on behalf of the Office of Human Services requesting temporary investigative authority and protective services for the children. That petition was granted on May 10, 1985. After receiving further referrals in the fall of 1985, the Office of Human Services petitioned for further temporary investigative authority and the right to place the children in foster care. That petition was granted on June 20, 1986, the District Court thereafter entered an order declaring J.C. and J.W. to be youths in need of care.

Following a dispositional hearing the District Court issued its order granting the continued temporary care of the children with the Department of Social and Rehabilitation Services (SRS) and in particular recommending that J.C. remain with his natural father in Arizona and J.W. remain in foster care. In the disposition order the court endorsed the treatment plan submitted by the Office of Human Services. On August 26, 1986, the mother appealed, challenging the District Court's order adjudicating J.C. and J.W. to be youths in need of care. This Court affirmed the District Court in May, 1987, see In the Matter of J.W. & J.C. (Mont. 1987), 736 P.2d 960, 44 St.Rep. 843.

In January 1987 the mother was involuntarily committed to Warm Springs State Hospital after attempting to commit suicide by shooting herself in the chest. During that commitment period her third child, R.W., was born. On May 27, 1987 R.W. was placed with the same foster family that is caring for J.W., her half-brother. A petition for temporary custody and temporary investigative authority regarding R.W. was filed on May 28, 1987. That petition is not a subject of this appeal. On June 18, 1987, the State filed a petition to terminate the mother's parental rights with respect to J.W. and J.C. The mother was released from Warm Springs State Hospital in early July 1987. On July 23, 1987, the District Court heard the petition for termination of the mother's parental rights and on October 13, 1987 terminated her rights with respect to J.W. That order awarded permanent custody of J.C. to his natural father. The mother now appeals. We affirm.

The issues before the Court are:

1. Did the District Court err when it concluded that the mother's condition rendered her unfit and was unlikely to change within a reasonable time?

2. Did the District Court err when it granted custody, care and control of J.C. to his natural father pursuant to the February 11, 1987, custody order issued by an Arizona Superior Court?

After the mother's release from Warm Springs State Hospital, various mental health authorities testified that her mental condition required termination of her parental rights with J.C. and J.W. Dr. Virginia Hill, a psychiatrist at Warm Springs State Hospital, said the mother suffers from chronic undifferentiated schizophrenia, an illness in which the subject does not realize how ill she is. Because the patients do not appreciate the extent of their illness they

3

tend not to comply with treatment plans. Staff at Warm Springs State Hospital were not able to administer medication to mother until after R.W. was born, Dr. Hill said, but once medication began the mother began to improve immediately. Dr. Hill testified that unless the mother abides by terms of the psychiatric plan prescribed for her, she would not be a proper parent.

When the mother was released from Warm Springs State Hospital, her psychiatric plan included her return to Helena under the guidance of the Offices of Human Services. This plan also would have allowed her weekly supervised visits with J.W. The mother has not adhered to this treatment plan; instead she went to Butte. She has filed for welfare and has been unable to make most of her visits with J.W. because she lacked transportation. On the occasions that the mother appeared for the visit, J.W. displayed no interest in the mother.

J.W. has been placed in a foster home now for about two years. This family considers him a part of the family and would adopt him if allowed to. Margaret Stuart, director of the Social Work Program at Carroll College, testified at the termination hearing that primary considerations include the child's age, his development level, and his home environment. She said that changing the home environment of a pre-school child such as J.W. is particularly touchy since this is a crucial stage of the child's development. The longer such a child is in one setting, the more traumatic it is to remove him from it. If the child is moved often enough he loses the ability to bond with parent figures and Ms. Stuart said a third placement is a "watershed" mark; any placement after that increases markedly the risk that the child will not be able to bond with parent figures. J.W. is currently in his third placement.

4

J.C., the older boy, has lived continuously with his father since November 1985, even though custody of J.C. was granted to the mother when the parents divorced in 1978. The father testified at the termination hearing that he has accepted the custody of J.C. on several occasions when the mother was disabled by her mental condition. J.C.'s father has remarried, and has purchased a home and the father and his new wife have space in their home for J.C. and have integrated him into their home. J.C. does well in school and participates in extra-curricular activities. He wrote a letter to the District Court in which he expressed a desire to remain with his father and stepmother.

On February 11, 1987, the father obtained an order from an Arizona Superior Court modifying the decree of dissolution so as to place permanent custody of J.C. with the father, subject to any order arising from the Montana proceedings. The mother did not appear for the Arizona proceedings and did not object to awarding custody of J.C. to the father since the father had assured her that she would always be able to see J.C. and enjoy visitation privileges.

Mother contends that the District Court abused its discretion when it terminated her parental rights since the court's findings do not comply with §§ 41-3-607 and 41-3-609, MCA. Under § 41-3-609, MCA, which establishes the criteria for terminating parental rights, mother says only one criterion applies. That is subsection (1)(c), which allows the court to terminate parental rights if the child has been adjudicated a youth in need of care and the parent has disregarded an appropriate treatment plan or such plan has failed, and the parent's condition rendering her unfit is unlikely to change in a reasonable amount of time. She then cites findings by the court that her schizophrenic condition "will likely endure throughout [her] life, but can be

5

controlled by the use of medication" and that "without such medication she will be incapable of parenting her children." The court ultimately concluded:

> [The mother's] mental illness is a chronic condition and because of her inability to follow through, the conduct that renders her unfit as a mother is not likely to change within a reasonable amount of time.

On review of a District Court's decision terminating a person's parental rights, the District Court is presumed to be correct. In Re the Matter of M.L.H. (Mont. 1986), 715 P.2d 32, 35, 43 St.Rep. 375, 379; In the Matter of J.L.F. (Mont. 1981), 626 P.2d 253, 255, 38 St.Rep. 533, 535. The findings of the District Court are not to be overturned "unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion." In Re the Matter of C.A.R. (Mont. 1984), 693 P.2d 1214, 1218, 41 St.Rep. 2395, 2399, citing In Re Gore (1977), 174 Mont. 321, 570 P.2d 1110. Because a termination of parental rights case is a non-jury matter, the District Court is held responsible for determining the credibility of witnesses and weighing the witnesses' testimony. In Re the Matter of R.M.B. (Mont. 1984), 689 P.2d 281, 284, 41 St.Rep. 1925, 1928.

The findings quoted from above plus the conclusion quoted above represent substantial credible evidence supporting the District Court. We find there is ample evidence in the record to support the court's findings and its conclusion. The mother argues that the conclusion of the District Court is inconsistent with the court's findings since the prospect of further treatment should entitle her to an opportunity to regain custody of J.W. She notes previous cases where this Court has stated that "family unity should

6

be preserved whenever possible." See, Matter of C.A.R, 693 P.2d 1214, 1221, In Re the Matter of M.R.L. (1980), 186 Mont. 468, 472, 608 P.2d 134, 137. This Court, though, has never placed family unity over the welfare of an abused or neglected child:

> [W]hen the rights of the youth to an adequate physical and emotional environment encounter demonstrated acts of commission or omission by the parents which deprive the youth of this environment, the best interest of the youth is paramount and takes precedence over parental rights or familiar bonds.

Matter of C.A.R., 693 P.2d at 1219. See also In the Matter of M.N. (1982), 199 Mont. 407, 410, 649 P.2d 749, 751. The viability of the "best interest" rule is underscored by § 41-3-609(3), MCA, which orders the District Court to give "primary consideration" to the needs of the child in determining whether the conduct or condition of the parents is unlikely to change within a reasonable time.

This Court has repeatedly directed District Courts to consider the "totality of the circumstances" when assessing the best interests of a child. In re Gore, 570 P.2d at 1114. After reviewing the facts of this case, it is readily apparent that the District Court order terminating the mother's parental rights to J.W. is in the infant's best interests.

We have difficulty following the mother's arguments that the District Court erred by terminating her parental rights to J.C. since the Arizona court already had amended its original divorce decree so as to give custody to the father. Neither did the District Court terminate all parental rights, holding merely that custody of J.C. "is placed with his natural father . . . subject to visitation as agreed to by [the father]." The wording of these two orders,

7

one by the Montana District Court and the other by the Arizona court, both made allowance for the decision of the other. They represent a delicate balancing of all the factors relevant to child custody proceedings. We will not disturb this balance.

The findings, conclusions, and judgment of the District Court are affirmed.

_John Conway Harrison_
Justice

We Concur:

_/. A. Turnage_
Chief Justice

_Justices_

8