No. 90-600

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

_____

IN THE MATTER OF THE CUSTODY
AND PARENTAL RIGHTS OF
F. M., JR., a Youth in Need of Care.

_____

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis & Clark,
               The Honorable Thomas C. Honzel, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

        J. Mayo Ashley, Helena, Montana

        For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
        James Yellowtail, Assistant
        Randi Hood, Public Defender's Office, Helena,
        Montana
        Mike McGrath, County Attorney; Carolyn Clemens,
        Deputy, Helena, Montana

_____

FILED

APR 30 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on briefs:   March 22, 1991

Decided:   April 30, 1991

Filed:

_____
                    Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The natural parents of F.M., Jr., appeal from the order of the First Judicial District Court terminating their parental rights and awarding custody and care of F.M. to the Montana Department of Family Services. We affirm.

The issue raised by the parents on appeal is as follows:

Did the District Court abuse its discretion when it terminated the parental rights of the father, F.M.M., and the mother, K.N.M.?

F.M. was born August 21, 1989. However, the involvement of the Montana Department of Family Services (Department) with F.M.'s family began shortly after they arrived in Montana in 1987. In 1987, F.M.M. and K.N.M., along with their daughter, M.M., moved to Lincoln, Montana, from New Hampshire. Shortly thereafter, the Department began to receive reports that M.M. was being abused by her parents.

On January 26, 1988, M.M. was admitted to St. Peter's Community Hospital with extensive bruises covering her body. These bruises were later determined to be the result of physical abuse.

On June 27, 1988, the District Court found M.M. to be a youth in need of care, granted temporary custody to the Department for six months, and ordered a treatment plan for K.N.M. and F.M.M.

On July 25, 1988, the District Court approved a treatment plan requiring the parents to obtain psychological counseling, attend parenting classes, and maintain visitation with M.M. As part of the treatment plan, the parents began therapy with Dr. Richard J.

2

Emery, a clinical psychologist. In their therapy with Dr. Emery, the parents denied any abuse of their daughter. They explained to Dr. Emery that M.M.'s bruises were caused by the fact that M.M. walked into furniture because of lack of sleep and that she had fallen down some stairs.

Dr. Emery believed that M.M. was physically abused by one or both of her parents, and recommended continued therapy and parenting classes. On February 7, 1989, the District Court approved a second treatment plan requiring continued therapy and increased visitation for the parents.

F.M. was born August 21, 1989, and M.M. was reunited with the family at approximately the same time. Once again, on November 6, 1989, the District Court granted the Department temporary investigative authority of M.M. The resulting investigation revealed abuse of both M.M. and F.M. Later, on November 15, 1989, the District Court granted the Department emergency temporary custody of both children pending a hearing.

The District Court held hearings on November 22 and December 15, 1989. The Department warned that the same pattern of abuse affecting M.M. was beginning to emerge with respect to F.M.

At the hearing, Mary Lou Nielson, a neighbor, testified that on two or three occasions she observed the mother, K.N.M., pretending to drop a sleeping F.M., jolting him awake. Donna Hale, a clinical social worker, testified that this act by K.N.M. is "a horrifying thing to do to a baby" and would create a "profound emotional disturbance in an infant." Kathleen Jury, a pastor,

along with Nielson, testified that they had watched K.N.M. sticking her tongue in F.M.'s mouth. At a subsequent hearing, Dr. Emery testified that this behavior constitutes sexual abuse. Both Jury and Nielson also testified that K.N.M. made comments and jokes about F.M.'s genitalia. Furthermore, Nielsen testified that K.N.M. told her that "sometimes when she changes him [F.M.], she plays with him so to speak." Finally, Jury testified that the parents gave F.M. Tylenol and codeine to induce sleep, even though there was no indication, according to Jury, that F.M. was ill.

On January 4, 1990, the District Court entered an order finding F.M. a youth in need of care "because of apparent sexual acts perpetrated against him by his mother, along with other acts to be determined abusive or neglectful." The District Court also found that M.M. "continues to be a youth in need of care because of continuing abuse of her by her parents." The District Court removed the children from the home and granted custody of the children to the Lewis and Clark County Department of Family Services. Furthermore, the court approved a treatment plan which required K.N.M. and F.M.M. to obtain psychological counseling, including a sex offender evaluation, if recommended by their therapist, and to maintain regular, supervised visitation with F.M.

On February 9, 1990, the District Court entered an order terminating the couple's parental rights to M.M. The District court found that the parents had made no significant progress upon the objectives of their previous treatment plans and that they needed long-term therapy to acquire appropriate parenting skills.

4

The parents did not contest the District Court's order terminating their parental rights.

Later that spring, on April 12, 1990, the Department filed a petition for termination of the couple's parental rights regarding F.M. At the termination hearing, the couple's primary therapist, Dr. Emery, testified that the parents had made no real progress in therapy until April 17, at which time the couple admitted only to abusing their daughter, M.M. Dr. Emery testified that the couple still denied abusing F.M., and concluded his testimony by maintaining that the couple's therapy had been unproductive in regard to F.M. due to their persistent denials of abuse.

Dr. Dwight Leonard, a psychologist who is Director of Psychology at Shodair Children's Hospital, also testified about his therapy sessions with K.N.M. and F.M.M. Dr. Leonard believed that the parents had made progress in their therapy and that if they continued to make progress, there was a good possibility F.M. could be returned to the couple. Dr. Leonard estimated that F.M. could be returned to his parents in two to three months if they continued to progress in therapy. Dr. Emery disagreed, and thought it would take perhaps a year of successful therapy before F.M. could be returned to his parents.

On June 21, 1990, the District Court continued the matter for 90 days to provide a further opportunity for the parents to complete the goals of their treatment plan. In addition, the court ordered Dr. Emery to provide the court with progress reports on the parents' therapy.

5

The District Court held a final round of hearings on October 2 and 16, 1990. At that time, Dr. Emery testified that the couple made no progress in therapy, a condition which he believed was unlikely to change in the future. Dr. Emery concluded that the parents remained a definite risk to F.M.

After terminating their therapy with Dr. Emery, the parents began seeing Craig Simmons, a licensed clinical social worker. Mr. Simmons, like Dr. Emery, testified that F.M. would not presently be safe with his parents and there remained a "long road" of therapy for F.M.'s parents.

In contrast, Dr. Leonard testified that in his opinion, F.M. could be safely returned to his parents. However, he also testified that he had met only three times with F.M.'s parents since the earlier hearings in May, and that he had not had an opportunity to observe the interaction between F.M. and his parents. Dr. Leonard was also willing to accept F.M.'s parents' explanation that they did not abuse F.M.

Sue Barton, F.M.'s guardian ad litem, also testified at the termination hearing. Ms. Barton testified that K.N.M. was exhibiting the same kind of enmeshment with F.M. that led to the abuse of M.M. She recommended to the court the termination of the couple's parental rights and the placement of F.M. in a permanent home.

On October 18, 1990, the District Court terminated the couple's parental rights of F.M. The court reiterated its earlier conclusion that F.M. "is a youth in need of care because his

6

health, care, and welfare have been harmed or threatened with harm by the acts or omissions of his parents." The court also found that the treatment plan had been unsuccessful.

The sole issue on appeal is whether the District Court abused its discretion in terminating the parental rights of F.M.M. and K.N.M.

The section of the statute relevant to this termination case is § 41-3-609, MCA, which states in part:

> **Criteria for termination.** (1) The court may order a termination of the parent-child legal relationship upon a finding that . . .
>
> * * * *
>
> (c) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.
> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making such determinations, the court shall consider but is not limited to the following:
> (a) emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
> (b) a history of violent behavior by the parent;
> (c) a single incident of life-threatening or gravely disabling injury to or disfigurement of the child caused by the parent;
> (d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

7

(e) present judicially ordered long-term confinement of the parent;

(f) the injury or death of a sibling due to proven parental abuse or neglect; and

(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions.

The state must prove "by clear and convincing evidence" that the statutory criteria under § 41-3-609, MCA, have been met. Matter of R.B. (1990), ___ Mont. ___, 788 P.2d 1361, 1363. Furthermore, "[w]e will not reverse a District Court's decision regarding findings of fact if those findings are supported by substantial credible evidence." Matter of R.B., 788 P.2d at 1363.

The fact that F.M. is a youth in need of care is not in dispute. The parents do contend, however, that the District Court abused its discretion in terminating their parental rights because there was insufficient evidence to support either the court's finding that the treatment plan failed, or the finding that their unfitness was not likely to change in a reasonable length of time. The state disagrees, and contends the record overwhelmingly supports termination of the parents' rights.

The parents' treatment plan required psychological counseling, including a sex offender evaluation, if recommended by their therapist, and regular, supervised visitation with F.M. The parents contend they fully complied with the treatment plan. However, as the state correctly notes, mere compliance with the

8

treatment plan is not enough. Section 41-3-609(1)(c)(i), MCA, imposes the additional requirement that the treatment plan be successful. The District Court found, and we agree, that the parents' treatment plan "has not been successful."

The District Court properly weighed the conflicting evidence in determining that the parents failed to successfully complete their treatment plan. The District Court properly based its finding on the testimony of Dr. Emery and Mr. Simmons, the primary therapists of the parents. We conclude that substantial credible evidence exists supporting the District Court's finding that the parties failed to successfully complete their treatment plan.

Next, the parents contend that the District Court's conclusion that their unfitness is unlikely to change within a reasonable time was not supported by substantial credible evidence. We disagree. Substantial credible evidence exists to support the District Court's finding.

Dr. Emery and Mr. Simmons testified that little progress has been made in therapy. Both Dr. Emery and Mr. Simmons saw little chance of the parents changing their conduct within a reasonable time. Ms. Barton, F.M.'s guardian ad litem, observed that the parents' rate of progress in therapy had been "glacial," and recommended that the court terminate the couple's parental rights.

In conclusion, the record contains substantial credible evidence to support the District Court's conclusions that the treatment plan failed and that the parents' lack of fitness is unlikely to change within a reasonable time. Accordingly, we

affirm the District Court's order terminating the couple's parental rights.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices