NO. 93-146

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN THE MATTER OF S.C.,
    A Youth in Need of Care.

FILED

FEB 22 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
                 In and for the County of Yellowstone,
                 The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Bard G. Middleton, Attorney at Law, Billings,
            Montana

        For Respondent:

            Hon. Joseph P. Mazurek, Attorney General, Elizabeth
            L. Griffing, **Ass't** Attorney General, Helena, Montana

            Dennis Paxinos, Yellowstone County Attorney, Denise
            Ackerman, Deputy, Billings, Montana

            Damon L. Gannett: Gannett **&** Ventrell, Billings
            Montana (Guardian Ad **Litem)**

Submitted on Briefs:  November 18, 1993

Decided:  February 22, 1994

Filed:

/Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Appellant, M.C., appeals the Thirteenth Judicial District Court, Yellowstone County, order which terminated her parental rights of her seven-year-old daughter, S.C., and awarded permanent custody and care of S.C. to the Montana Department of Family Services. We affirm.

M.C. presents two issues:

1. Did the District Court err by deciding that two treatment plans were appropriate to M.C.'s needs when the social worker testified that the treatment plans did not meet M.C.'s needs?

2. Did the District Court err by deciding that M.C.'s mental condition and chaotic lifestyle were unlikely to change within a reasonable time when the court based that decision, in part, on testimony that did not exist in the record?

S.C. was born on May 2, 1985. M.C. is the natural mother of S.C. and S.C.'s natural father is deceased. The Department of Family Services' (Department's) first contact with M.C. and S.C. was on May 22, 1985, when M.C. asked the Department to watch S.C. The Department communicated with M.C. about S.C. many more times in 1985. The case was closed in 1986.

However, in April 1988, the Department received a report that M.C. contemplated hurting S.C., who, at that time, was almost three years old. The counselor arranged for S.C. to go to her maternal grandfather's home in Helena, Montana. S.C. was in Helena until August 1988. M.C. later informed the Department that S.C. was in her care in Billings. The Department assigned a social worker and child care was arranged for S.C.

In October 1989, the Department petitioned for temporary

custody of the child. On October 30, 1989, the District Court named S.C., then four years old, a youth in need of care and granted the Department temporary custody of S.C. The Department's goal was to stabilize M.C. and reunite her with her daughter at a later date.

On May 2, 1990, M.C. and S.C. were reunited. However, almost immediately after this placement, M.C. experienced parenting problems. By July 1, 1990, she was depressed to the point that she discussed the possibility of returning S.C. to foster care. In August 1990, S.C. was returned to her maternal grandfather and step-grandmother in Helena.

In October 1990, the Department again petitioned the court for temporary custody of S.C. M.C. acknowledged her inability to parent S.C. and consented that S.C. be placed in the Department's temporary custody. The court placed S.C. in the Department's temporary custody through October 1991.

In October 1991, the Department petitioned the court for permanent custody of S.C. and termination of M.C.'s parental rights. The Department stayed the petition, however, in a last-ditch effort to reunite M.C. with S.C. The court continued the temporary custody order through October 1992 and ordered M.C. to complete a treatment plan.

The Department and M.C. signed a treatment plan and the court approved the plan as "appropriate to the family's needs" on October 10, 1991. Between December 11, 1991, and May 20, 1992, M.C. complied with the treatment plan. On May 20, 1992, M.C. was so

3

depressed that she was admitted to the hospital. This setback delayed S.C.'s return to her care.

On June 29, 1992, the court approved a second treatment plan as appropriate to the needs of the family. M.C. complied with the second treatment plan. On July 31, 1992, S.C., then seven years old, was returned to M.C.'s care.

While in her mother's care, S.C. stayed with her maternal grandmother three to four nights a week. S.C.'s maternal grandmother lived with a man who was charged with sexually assaulting a child. The Department instructed M.C. not to allow any contact between that man and S.C. Despite the Department's instructions, S.C. continued to stay with her maternal grandmother three to four nights a week.

On August 29, 1992, M.C. was hospitalized because she overdosed on prescription drugs. Three weeks later, M.C. attempted to commit suicide by overdosing on prescription drugs. During M.C.'s hospitalizations, S.C. was in the care of her maternal grandmother and the man charged with sexual assault.

The Department's attempt to reunite M.C. and S.C. was cut short. The Department decided to place S.C. back into foster care. Tragically, M.C. only parented S.C. for seven weeks, which included the three to four nights a week in which M.C.'s mother took care of the child.

Since October 1989, S.C. has only been in M.C.'s care for a total five and one-half months. At best, M.C. has had minimal contact with S.C., even when the Department returned the child to

her care.

In October 1992, M.C. was hospitalized four more times for mental problems and suicidal tendencies. All told, M.C. was hospitalized seven times in a five and one-half month period for mental problems and suicidal tendencies.

On October 6, 1992, the Department petitioned the court for permanent custody of S.C., who was then seven and one-half years old. The Department also petitioned the court to terminate M.C.'s parental rights. The District Court, after hearing the evidence, issued its findings of fact, conclusions of law and judgment on January 21, 1993. The court terminated M.C.'s parental rights and awarded permanent custody and care of S.C. to the Department. M.C. appeals.

I

Did the District Court err by deciding that two treatment plans were appropriate to M.C.'s needs when the social worker testified that the treatment plans did not meet M.C.'s needs?

Section 41-3-609(1), MCA, provides that a court may terminate a person's parental rights if it finds that:

> (c) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.][Emphasis added.]

"The State has the burden of proving by 'clear and convincing' evidence that the statutory criteria under [§] 41-3-609, MCA, have been met." Matter of J.H., S.H. & N.H. (1992), 252 Mont. 31, 34, 825 P.2d 1222, 1224. Our standard of review when examining a

5

district court's decision to terminate parental rights is whether the court interpreted the law correctly and whether the court's findings of fact are supported by substantial evidence. Matter of F.M. (1991), 248 Mont. 358, 363, 811 P.2d 1263, 1266; Matter of J.W. & J.C. (1988), 232 Mont. 46, 50, 757 P.2d 769, 771.

In the instant case, the District Court adjudicated S.C. a youth in need of care, approved two treatment plans and decided that the plans were appropriate. The District Court found that the plans addressed M.C.'s mental health problems and her inept parenting skills. The court in Conclusion of Law No. 3 stated:

> The Treatment Plans for [M.C.] were appropriate for the needs of this family, and were approved by this Court. They were complied with, but were not successful in resolving [M.C.'s] long-term mental illness problems.

M.C. argues that the social worker testified that the treatment plans did not meet her needs and, thus, the District Court erred, when it decided that the treatment plans were appropriate for the needs of this family. M.C.'s argument lacks merit.

The social worker's testimony, when read in context with his remaining testimony, established that he was simply expressing that M.C. had shown no improvement even though she was attending psychological treatment and counseling. From his testimony it is clear that the treatment plans were appropriate, but M.C. was unable to improve from the treatment she received.

He testified that the Department established an elaborate support system which included counselors, psychiatrists, and programs to improve M.C.'s mental health. Even with that support

6

system in place, M.C. was hospitalized seven times for mental health reasons and she even attempted suicide. In short, M.C. complied with the treatment plans, but the treatment plans were not successful in resolving her mental health problems.

It is well established that a parent must not only comply with the treatment plan, but the treatment plan must also be successful. J.H., 825 P.2d at 1226. After reviewing the record in this case we conclude that the District Court properly determined that the treatment plans were appropriate and they were complied with, but were not successful in resolving M.C.'s long-term mental illness problems.

## II

Did the District Court err by deciding that M.C.'s mental condition and chaotic lifestyle were unlikely to change within a reasonable time when the court based that decision, in part, on testimony that did not exist in the record?

The District Court in Finding of Fact No. 27 stated:

[w]hen asked whether [M.C.'s] condition was likely to change in a reasonable amount of time, [the social worker's] response was negative because of [M.C.'s] on-going mental illness and her past history of mental illness. [M.C.'s doctor] . . . was also not able to provide a time frame for improvement sufficient to allow parenting.

These facts provided the basis for Conclusion of Law No. 3:

[M.C.'s] mental illness renders her unfit and unable to provide [S.C.] with adequate parental care and guidance. Her conduct and condition has [sic] remained unchanged the past year and is [sic] unlikely to change within a reasonable time.

At trial, the social worker was asked this question: "In your opinion is [M.C.'s] conduct [or] condition that renders her unfit likely to change in a reasonable time?" M.C.'s attorney objected

to the question for lack of foundation and the court sustained the objection. The social worker was never allowed to answer the question. Thus, M.C. argues that the first sentence of Finding of Fact No. 27 is not supported by substantial evidence.

Although the District Court based its decision on testimony which did not exist, the court's mistake in Finding of Pact No. 27 does not constitute reversible error. This Court has repeatedly stated that a district court's decision will not be reversed or remanded when the eventual result of the case would be the same without the error. In re Marriage of Cannon (1985), 215 Mont. 272, 275, 697 P.2d 901, 903. In this case, disregarding the first sentence of Finding of Fact No. 27, there was still substantial evidence to support the ultimate finding and conclusion that M.C.'s mental condition, which rendered her unfit, was unlikely to change within a reasonable time.

M.C.'s psychiatrist and therapist both testified thatM.C. was unable to take care of herself, let alone take care of the needs of a seven-year-old girl. M.C. could not put S.C.'s needs before her own.

Even when M.C. cared for S.C., her care was, at best, sporadic, inconsistent and unstable. At the time of trial she could not care for S.C. and she has been unable to care for the child during the past three years. In fact, in those three years, S.C. was only in M.C.'s care, off and on, for a total of five and one-half months. Moreover, while in M.C.'s care during those five and one-half months, S.C. spent three to four nights a week at her

maternal grandmother's house, where her grandmother lived with a man who was charged with sexually assaulting a child.

M.C.'s psychiatrist testified that S.C. suffered from major depression, recurrent generalized anxiety and a borderline personality disorder. M.C.'s psychiatrist could not provide a time limit for her recovery.

In evaluating whether a parent's conduct or condition rendering her unfit is unlikely to change within a reasonable time:

> the court [must] consider but is not limited to the following:
> **(a)** emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
> (b) a history of violent behavior by the parent;
> (c) a single incident of life-threatening or gravely disabling injury to or disfigurement of the child caused by the parent:
> (d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;
> (e) present judicially ordered long-term confinement of the parent:
> (f) the injury or death of a sibling due to proven parental abuse or neglect: and
> **(g)** any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

Section 41-3-609(2), MCA.

Here, the court considered M.C.'s mental illness. Since 1989, M.C.'s mental health has severely affected her parenting ability. First, she threatened to hurt S.C. Next, several mental health hospitalizations forced M.C. to send S.C. into different homes and even to her mother, who lived with a man charged with sexual assault of a child. Most recently, in the five and one-half months

9

before trial, M.C. was hospitalized seven times for suicidal tendencies and mental health problems.

The court also considered the Department's extensive efforts in attempting to rehabilitate M.C. The Department set up an elaborate support system for M.C., including psychiatrists, counselors and social workers. Despite that support system and the Department's efforts to improve her mental health, M.C.'s mental health was only slightly improved, if at all.

She attended counseling and parenting classes, but she was unable to implement what she learned and she failed to use that information to change her lifestyle. Her needs were too great and S.C.'s needs went by the wayside for three years while the Department futilely attempted to reunite M.C. with S.C.

Moreover, the District Court was bound to give paramount consideration to the urgency of S.C.'s needs and S.C's needs take precedence over M.C.'s parental rights. See J.H., 825 P.2d at 1224-25; see also Matter of H.R.B. & K.R.B. (1989), 239 Mont. 387, 390, 780 P.2d 1139, 1141. Section 41-3-609(3), MCA, mandates:

> [i]n considering any of the factors in [§ 41-3-609(2)] . . . , the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

Here, the testimony established that S.C. needed stability and predictability in her life. The testimony confirmed that further delay in providing S.C. with stability and predictability would cause her substantial emotional harm. In short, S.C.'s emotional well-being was threatened by M.C.'s chaotic and unstable lifestyle.

After a review of the record, we conclude that the District

Court's ultimate finding--that M.C.'s mental health rendered her unfit to parent and her mental health was not likely to improve in a reasonable time--was supported by substantial evidence. Specifically, 1) expert testimony established that M.C. had all she could handle just taking care of herself: 2) M.C.'s mental health only improved slightly during the three years the Department worked with her: 3) of those three years, she was only able to parent S.C. for five and one-half months: 4) even with the Department's support system, M.C. was hospitalized seven times in a five and one-half month period for mental health and suicidal tendencies: 5) M.C. left S.C. in the care of her mother, who lived with a man charged with sexually assaulting a child: and 6) most importantly, S.C.'s needs for stability and predictability were extremely urgent. The District Court correctly determined that S.C.'s emotional needs prevailed over M.C.'s parental rights. See H.R.B., 780 P.2d at 1141. We uphold the court's decision to terminate M.C.'s parental rights.

_____
                    Justice

We concur:

_____
        Chief Justice

_____

_____
        Justices

11

Justice Terry N. Trieweiler specially concurring.

I specially concur with the result of the majority opinion. However, I do not agree with all that is said therein.

I agree that there was substantial evidence to support the District Court's finding that M.C.'s mental health rendered her unfit to serve as S.C.'s parent and that that condition was unlikely to improve in the near enough future to be of benefit to S.C. However, I disagree with the majority's repeated reference to the irrelevant fact that M.C.'s mother lived with a man "charged with sexually assaulting a child."

The mere fact that someone with whom S.C. was allowed to associate was "charged" with something has no significance. If there is any place where a person ought to be entitled to a presumption that a mere charge of wrongdoing has no legal significance, it is in the highest court of the state. And yet, the majority opinion embarrassingly refers no fewer than five times to the fact that S.C. was allowed to associate with a person "charged" with criminal conduct. Those references are unnecessary and inappropriate bases for the majority's decision.

_____
Justice

12