No. 03-752

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 299N

IN RE THE MARRIAGE OF

CHERRI L. GENTRY,

Petitioner and Appellant,

v.

RAY D. GENTRY,

Respondent and Respondent.

APPEAL FROM:     District Court of the Sixteenth Judicial District,
                 In and for the County of Carter, Cause No. DR 2002-3035
                 The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                J. Dennis Corbin, Attorney at Law, Miles City, Montana

        For Respondent:

                James C. Reuss, Guthals Hunnes Reuss & Thompson, Billings, Montana

                                        Submitted on Briefs:  March 2, 2004

                                              Decided:  October 26, 2004

Filed:

        _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Cherri L. Gentry (Cherri) appeals the judgment of the Sixteenth Judicial District Court, Carter County, which equally divided the marital estate she had established with her former husband, Ray D. Gentry (Ray), and ordered that Ray should provide her with maintenance.

¶3 We affirm.

¶4 We address the following issues on appeal:

¶5 1. Did the District Court err by not valuing the horses that were divided between the parties?

¶6 2. Did the District Court err by awarding the American Funds account to Ray?

¶7 3. Did the District Court err in failing to correct its mischaracterization of an exhibit to Ray's Proposed Findings of Fact and Conclusions of Law?

### FACTUAL AND PROCEDURAL BACKGROUND

¶8 Ray and Cherri were married for twenty years before their marriage ended in a dissolution. For the majority of the marriage, Ray worked in the oil fields. There he acquired the skills of an oilrig tool pusher, in which capacity he was employed when the

2

marriage was dissolved. He was paid approximately eighty-seven thousand dollars per year, and provided with medical insurance and a retirement plan.

¶9 Ray's employment required his absence from the family home for long periods, and so the greater share of responsibility for maintaining the household, and for raising the children whom Cherri had brought into the marriage, fell to her. Cherri also worked hard in the couple's farming and cattle-raising business after Ray went to the oil fields early in their marriage, and she babysat to earn extra money. When Ray and Cherri later switched from cattle to horses, she tended these animals, too.

¶10 The District Court heard testimony and received evidence regarding Ray's and Cherri's marital assets at their dissolution bench trial. Each party submitted proposed findings of fact and conclusions of law, together with an exhibit to illustrate the distribution requested, before the trial.

¶11 For present purposes, the exhibits differ notably in two respects. First, Cherri's exhibit itemized the horses which belonged to the marital estate, purported to value them, and indicated who should receive each horse. Ray's exhibit (hereinafter, "Exhibit A") merely read "split" in the "Horses" entry in both the "To Husband" and "To Wife" columns, and assigned no values to the horses. Secondly, Cherri proposed that she receive the American Funds account; Ray, that he receive it.

¶12 The District Court, however, found that the parties had agreed to Exhibit A, and ruled that such a distribution, as supplemented by its further findings of fact, would be equitable.

3

The District Court's Final Decree of Dissolution of Marriage subsequently ordered the marital estate to be thus divided.

¶13 Cherri, through her attorney, quickly discovered the District Court's mistake regarding its characterization of Exhibit A, and timely moved the court to alter or amend its Final Decree. But as noted in the District Court's Memorandum Regarding Motions to Amend Findings of Fact, Conclusions of Law and Order, dated September 18, 2003, this motion itself escaped the notice of the District Court, which allowed the motion to be deemed denied as provided by Rule 59(g), M.R.Civ.P.

¶14 Cherri now appeals the findings of fact and decree from the District Court.

## STANDARD OF REVIEW

¶15 We review a district court's findings of fact regarding a division of marital assets to determine whether the findings are clearly erroneous. *In re Marriage of Gerhart*, 2003 MT 292, ¶ 15, 318 Mont. 94, ¶ 15, 78 P.3d 1219, ¶ 15. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *Albinger v. Harris*, 2002 MT 118, ¶ 13, 310 Mont. 27, ¶ 13, 48 P.3d 711, ¶ 13. We review a district court's conclusions of law to determine whether its interpretation and application of the law are correct. *In re Marriage of Weber*, 2004 MT 206, ¶ 14, 322 Mont. 324, ¶ 14, 95 P.3d 694, ¶ 14.

## DISCUSSION

¶16   **1. Did the District Court err by not valuing the horses that were divided between the parties?**

¶17   As noted above, the District Court based its distribution of the marital estate upon Exhibit A, a document which neither values the horses nor sets forth how they are to be divided between the parties. Cherri argues that in doing so, the District Court neither completely valued the estate nor supplied enough information to allow for a proper review of its distribution. She claims that these omissions amount to an abuse of discretion.

¶18   We disagree. The District Court heard substantial testimony from both Cherri and Ray tending to establish that the parties had agreed to a distribution of the horses, that they had effected this distribution several months prior to the hearing, and that Exhibit A's statement that the horses had been "split" was a reference to this fact.

¶19   For example, the transcript records the following colloquies between Cherri's attorney and Ray:

> Q. Okay. But as to the horses you have just listed that – they are split; isn't that correct?
> A. Yes, we divided the horses.
>
> Q. Now, I can't remember the numbers on the horses, but you have approximately half the horse herd, do you not?
> A. I've got a little more than half of the horse herd.
> Q. And Cherri has a portion of the horse herd also; is that correct?
> A. Yes, she does.

¶20   The record also reflects the following exchange between Ray and his attorney:

> Q. (By Mr. Reuss) I want to talk about three things on that Exhibit A, Ray, and horses was one of them, so I'll start with that.
> A. Okay.

5

Q. Following up on your testimony here earlier, is it your belief that sometime during the course of this proceeding, you and Cherri met, or met over a series of occasions, and made an agreement about dividing the horse herd?
A. Yes, we did.
Q. Okay. And who picked what horses, when, where?
A. Uh, Cherri made a list of the horses that she was going to keep and what was going to me, and I agreed to it.
Q. What did you tell her then at the close of that meeting, or some time thereafter?
A. I asked her if this was the final on the horse division, and if it was going to come up again in six months or a year or what, as far as the value of the horses, and she said it wouldn't.

¶21 Furthermore, the record reflects the following exchange between Cherri and her attorney:

Q. Cherri, I'll show you what's been marked for identification purposes as Petitioner's Exhibit Number 11. Have you seen that document before?
A. Yes, sir.
Q. And who made that document?
A. I did.
Q. And who was with you when you made it?
A. Well, I don't guess anybody was with me when I made it. I made it for purposes of the banker, when we go down for our yearly assessment of assets and liabilities and whatever. And we went down there and we got –
Q. Slow down, Cherri. Who is we?
A. Ray and I. We –
Q. You went where?
A. To the First National Bank. Our banker is Mike Clatey, and he always – we have to list in horses – I mean Ray has always 'this is what this is worth, this is what this is worth.' This was submitted as our January inventory and submitted to the bank as value on the horses.
Q. It was attached to a Financial Statement, wasn't it?
A. Yes, it was, our yearly Financial Statement.
Q. And then we took it off that, did we not, and we marked them as in regards to use later as to who got what; is that correct?
A. That's right. I – When Ray and I discussed this on the phone, he asked me if I wanted to keep any of the horses, and I told him I would think about. And after thinking about it and discussing it with a few family members and my children, I decided I would keep a few rather than just drop the ball immediately, as it were.
Q. As you look there, yellow is Ray's, pink is yours? Is that correct?

6

A. Right.

Q. Is that division, as it sits there, the actual division that you did?

A. Yes it is.

Mr. Corbin: I'd offer Petitioner's 11.

Mr. Reuss: I have no objection, Your Honor.

THE COURT: 11 is admitted.

¶22 We conclude, therefore, that it was within the District Court's discretion to find that this distribution was agreed upon and carried out by the parties. We further conclude that the District Court did not abuse its discretion in omitting the horse distribution from its general valuation of the estate, since its findings as a whole are sufficient to determine that the distribution of the marital estate was equitable. *See In re Marriage of Harkin*, 2000 MT 105, ¶ 31, 299 Mont. 298, ¶ 31, 999 P.2d 969, ¶ 31.

¶23 Moreover, the District Court's mistaken characterization of Exhibit A as an agreed-upon distribution, though error, is harmless, at least in regards to the distribution of the horses. As noted above, Exhibit A did not specify how the horses were to be distributed; rather, it merely referred to the fact that they had already been divided by the parties themselves. Thus, the horse distribution which the District Court acknowledged and endorsed in its final order was not determined by Exhibit A, but by the division which the parties had already finalized and effected. A district court's decision will not be reversed or remanded when the eventual result of the case would be the same without the error. *In the Matter of S. C.* (1994), 264 Mont. 24, 30, 869 P.2d 266, 269. The District Court's misunderstanding regarding Exhibit A had no effect upon the horse distribution, and constitutes harmless error.

7

¶24     **2. Did the District Court err by awarding the American Funds account to Ray?**

¶25     As noted above, Exhibit A differed from Cherri's proposed findings and conclusions in that it suggested to the District Court that it should award the American Funds account to Ray. Cherri further claims that the parties agreed, prior to the trial, that Cherri should receive the American Funds account. Cherri thus argues that the District Court's awarding Ray this mutual fund account arose from two distinct errors: the court's disregard of the parties' agreement as to the disposition of the account, and its mistaken characterization of Exhibit A as an agreed-upon distribution.

¶26     We disagree. The District Court heard substantial testimony tending to establish that the alleged agreement merely represented a stage in the parties' pre-trial negotiations, and was never concluded by them. It was within the District Court's discretion to credit this testimony.

¶27     As for the District Court's mistaken characterization of Exhibit A, we hold that it is harmless error in regards to the distribution of the American Funds account, as well. The District Court did not base this award to Ray on an agreement of the parties. Rather, the basis was its finding that distributing the estate's real and personal property and indebtedness in accordance with Exhibit A, as supplemented, would be equitable. The District Court's misunderstanding, therefore, appears to have had no significant impact upon the result it reached. *In the Matter of S. C.*, 264 Mont. at 30, 869 P.2d at 269 (despite erroneous factual finding, substantial evidence to support ultimate finding and conclusion precludes reversal).

8

**¶28    3.  Did the District Court err in failing to correct its mischaracterization of an exhibit to Ray's Proposed Findings of Fact and Conclusions of Law?**

¶29    Because we hold that the District Court's mistaken characterization of Exhibit A as an agreed-upon distribution constitutes harmless error in both the ways in which Cherri claims it influenced the District Court's judgment, we need not address this assignment of error.

¶30    We affirm.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE