No. 98-246

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 264

IN RE THE CUSTODY AND

PARENTAL RIGHTS OF P.M.,

A Youth in Need of Care.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

Honorable Thomas C. Honzel, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

Jeremy Gersovitz, Public Defender's Office, Helena, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; Mark Mattioli,

Assistant Attorney General, Helena, Montana

Mike McGrath, County Attorney; Carolyn A. Clemens, Deputy

County Attorney, Helena, Montana

Randi M. Hood, Public Defender's Office (Guardian Ad Litem),

Helena, Montana

Submitted on Briefs: September 10, 1998

Decided: November 5, 1998

Filed:

No

_____

Chief Justice J. A. Turnage delivered the Opinion of the Court.

**¶1. This is an appeal by S.P., the mother of P.M., from the judgment of the First Judicial District Court, Lewis and Clark County, terminating her parental rights. We affirm the judgment of the District Court.**

## ISSUE

**¶2. Did the District Court err in terminating the parental rights of S.P. with regard to her minor son, P.M.?**

## BACKGROUND

**¶3. P.M. was born on November 21, 1990, to R.M., his biological father, and S.P., his biological mother. For most of his life P.M. has been raised solely by his mother, S.P., and it is only with regard to her rights that this appeal is concerned.**

**¶4. P.M. is a little boy with big emotional problems. He has been diagnosed with a pervasive development disorder, not otherwise specified, within the autistic spectrum. This disorder is manifested by retreat into a fantasy world whenever outward stimulation becomes too stressful or overwhelming, an inability to form reciprocal social interactions, echolalia, odd repetitive behavior, and noncommunicative speech patterns. P.M. has also exhibited episodic aggressiveness and intractable tantrums. Although P.M. is currently seven years of age, he functions at the emotionally developed stage of a two or three year old. Over the last eighteen months, P.M. has been a patient at the Intermountain Children's Home (hereinafter Intermountain) in Helena, Montana, where he is receiving treatment for his emotional disorder. The prognosis for P.M. indicates that he requires a long-term,**

stable, structured living environment if he is ever going to achieve a normal level of emotional development.

¶5. P.M.'s biological mother, S.P., has been diagnosed with a number of emotional problems of her own, including recurrent, severe depression with psychotic features, Post Traumatic Stress Disorder, alcohol dependence and poly-substance abuse. Symptoms of S.P.'s depression include sleeping for days at a time and going several days without eating. The psychotic features related to her diagnosis include disassociation, disorientation, loss of time of day and hearing voices. She also exhibits short-term memory loss and has a history of abusive relationships involving battery by a male companion. S.P. has a history of suicidalization and at least one known suicide attempt in April 1996 for which she was hospitalized.

¶6. S.P. admitted P.M. into Intermountain in April 1996 when none of the local schools were willing to enroll him and she could no longer control him on her own. The Department of Public Health and Human Services (hereinafter DPHHS), was not involved in the decision to place P.M. into inpatient care, although it had been involved with S.P. and P.M. for several years.

¶7. After P.M. had been admitted to Intermountain for several months, DPHHS filed a petition seeking protective services and temporary custody of P.M., along with temporary investigative authority and adjudication of P.M. as a youth in need of care. S.P. signed a stipulation granting temporary investigative authority and agreeing that P.M. was a youth in need of care. S.P. and the DPHHS also entered into a treatment plan for S.P. which was approved by and filed with the District Court in June 1997.

¶8. This treatment plan required S.P.:

To deal with her mental health issues with professionals approved by DPHHS. [S.P.] has a multitude of professionals involved in her life which need to be case managed by the Adult Services Worker at the program run through Mental Health. This would include the monitoring of medication as prescribed by her psychiatrist.

To deal with her drug and/or alcohol issues with [a] professional approved by DPHHS. [S.P.'s] use of alcohol in the past has [prevented] her from dealing successfully with her mental health issues. [S.P.] will agree to drug testing to ensure her prescribed medications

are at the appropriate level and the use of illicit drugs and/or alcohol are not interfering with her treatment.

To attend and participate in on-going counseling with a therapist approved by DPHHS.

To authorize the professionals to make written reports as well as frequent updates available to DPHHS indicating progress made in treatment and any further recommendations they may have.

To cooperate with the professionals involved with her son [P.M.] at the Intermountain Home. This would include consistent visits with [her] son, as set up by the home, as well as cooperating with the staff, to ensure the best possible consistent treatment for her son.

To cooperate and follow through with suggestions by the counselors [and] DPHHS Social Worker relating to the emotional, psychological and physical well being of [P.M.].

The treatment plan also required S.P. to remain a law-abiding citizen and stipulated that the failure to comply with the goals set forth in the plan would be grounds for considering alternate living arrangements for P.M., including the possibility of foster care.

**¶9. On October 22, 1997, DPHHS filed its petition seeking the termination of S.P.'s parental rights with regard to P.M. A hearing was held in December 1997, and in February 1998 the District Court issued its order terminating S.P.'s parental rights and transferring permanent legal custody of P.M. to the DPHHS. It is from this order that S.P. appeals.**

## STANDARD OF REVIEW

**¶10. Our standard of review of a district court's decision to terminate parental rights is whether the court's factual findings are clearly erroneous and whether the court's conclusions of law are correct. *In re A.W.M.*, 1998 MT 157, ¶ 8, 960 P.2d 779, ¶ 8, 55 St.Rep. 628 ¶ 8; *Matter of D.H. and F.H.* (1994), 264 Mont. 521, 524-25, 872 P.2d 803, 805. Factual findings are clearly erroneous if they are not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. *Interstate Prod. Credit Ass'n v. De Saye* (1981), 250 Mont. 320, 323, 820 P.2d 1285, 1287.**

## DISCUSSION

_____

**¶11. The District Court's authority over this matter is derived from the Parent-Child Legal Relationship Termination Act of 1981. The criteria for termination of a parent's rights is found in § 41-3-609, MCA, which reads in pertinent part:**

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

. . .

(d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

No

. . .

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child . . . .

**¶12. This Court has recognized that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re R.B., Jr.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848. Accordingly, prior to terminating an individual's parental rights, the district court must adequately address each applicable statutory requirement to determine if it has been established, and the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. *In re E.W.*, 1998 MT 135, ¶ 12, 959 P.2d 951, ¶ 12, 55 St.Rep. 536, ¶ 12. "In the context of parental rights termination cases, we have defined clear and convincing evidence as 'simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of the proof.'" *In re E.W.*, ¶ 13 (quoting *In re J.L., D.L., and A.G.* (1996), 277 Mont. 284, 289, 922 P.2d 459, 462).**

**¶13. Although the District Court did not specify upon which of the alternate provisions of § 41-3-609, MCA, it was relying in terminating the parental rights of S. P., the findings of fact and conclusions of law set forth in the February 6, 1998 order indicate that the District Court found the provisions of both § 41-3-609(e), MCA, and § 41-3-609(f), MCA, satisfied under the facts of this case. Because S.P. had previously stipulated that P.M. was a youth in need of care, that issue is not in dispute. The District Court found that a valid treatment plan had been approved by and filed with the court, the terms of that treatment plan had not been complied with, the conditions rendering S.P. unfit to parent P.M. were not likely to change within a reasonable time, P.M. had been in an out-of-home placement for the preceding 18 months, and termination of S.P.'s parental rights was in the best interest of P.M. S.P. contests these findings, arguing that the terms of the treatment plan were substantially complied with and that with continued therapy her own condition is likely to improve within a time frame in which P.M. could reasonably and safely be returned to her care.**

¶14. The argument asserted by S.P. on appeal is unsupported by the evidence in the record. Two of the goals of S.P.'s treatment plan were that she deal with her mental health issues and attend on-going counseling with an approved therapist. Evidence in the record reveals that from November 1995 to April 1996, S.P. maintained a regular therapy schedule with a clinical social worker; however, because of difficulties with her Medicaid coverage, S.P. terminated these sessions around the same time that P. M. was placed in Intermountain.

¶15. It was the suggestion of S.P.'s therapist that S.P. apply for SSI to assist her with her financial difficulties and that she continue therapy. The therapist also offered to continue S.P.'s sessions without cost until the application for SSI went through, at which time the sessions could be paid for retroactively. S.P. declined the suggestion of her therapist to continue her sessions and apply for SSI at that time. S.P. contacted her therapist in May 1996 to request a session but could not get an appointment until July 18, 1996. She attended the counseling session on July 18, but participated in only two additional sessions between July 1996 and December 1996.

¶16. Another goal of the treatment plan was that S.P. deal with her alcohol and substance abuse problems. S.P.'s therapist testified before the District Court that S. P.'s chemical dependency problems were a major barrier to the resolution of her mental health issues, and that because of the severity of S.P.'s dual diagnoses, S.P. would probably need inpatient treatment to effectively deal with her substance abuse problem. S.P. declined to follow this suggestion on the grounds that such a program would require her to be away from P.M. for 30 days and that she had previously tried an inpatient detoxification program but had been unsuccessful. S.P. indicated that she preferred trying to deal with her chemical dependency problems on her own.

¶17. Between the time that the treatment plan was filed in June 1996 to the time the DPHHS commenced these proceedings to terminate S.P.'s parental rights in October 1996, the DPHHS had only requested one urinalysis test of S.P. The results of this test were positive for the presence of alcohol and THC. S.P. also had one of her scheduled visits to P.M. at Intermountain canceled by the hospital staff because she was intoxicated when she arrived for the visit. There is no evidence in the record that S.P. was seeking any form of treatment apart from her occasional therapy sessions to address her alcoholism and drug abuse problems from the time her treatment plan was first formulated until the District Court terminated her parental rights.

¶18. S.P.'s treatment plan also required her to cooperate with the professionals at Intermountain to provide the best possible treatment for her son. Encompassed within the need for cooperation was the necessity of regular, consistent visits between S.P. and P.M. at the Intermountain facility. From April 1996 to March 1997, S.P. missed 17 out of 33 scheduled visits and 31 of 68 telephone calls with P.M. The effect of these missed visits on P.M. was severe, and the staff at Intermountain indefinitely suspended visits from S.P. in March 1997, because P.M. became aggressive with the staff, his teachers, and other students whenever S.P. failed to make her appointed visits.

¶19. The staff at Intermountain reiterated to S.P. the need for her to be consistent and regular in her attendance at these meetings, but when they recommenced the visits between S.P. and P.M. beginning May 8, 1997, S.P. missed the visit scheduled for that day. On July 17, 1997, S.P. missed a visit in which she and P.M. were supposed to go to Marysville to visit with P.M.'s grandparents, because S.P. had been badly beaten by her boyfriend the night before and did not want P.M. to see her in her battered condition. On September 25, 1997, S.P. missed a visit with P.M. when the Intermountain staff sent her home for being intoxicated.

¶20. On October 2, 1997, S.P. and P.M. had a very emotional meeting in which P.M. confronted S.P. with his feelings about her lying, drinking, gambling, and abusive relationships. The visit was very hard on both S.P. and P.M., and the staff at Intermountain decided to postpone the next week's meeting. However, S.P. did not show up for the next visit, and her social worker and the staff at Intermountain later learned that she had left the state for some period of time. The October 2, 1997 visit was the last time S.P. visited P.M. at Intermountain.

¶21. Another of S.P.'s treatment goals was to cooperate and follow through with suggestions by counselors and social workers in relation to the well-being of P.M. Included among these suggestions was the need for S.P. to keep herself safe, and this included avoiding abusive relationships with male companions who had battered her in the past. However, despite the constant admonitions of her caseworker and others, S.P. continued to maintain her relationship with her abusive boyfriend and was beaten by him on at least one occasion subsequent to the formulation of her treatment plan.

¶22. The last goal set forth in the treatment plan was that S.P. should remain law-

abiding. However, in December 1997, S.P. was arrested and jailed on two felony charges of forgery and issuing bad checks. S.P. had indicated to her case worker that her reason for writing the checks was to obtain money for gambling.

¶23. The testimony of S.P.'s therapist indicates that S.P. is in need of a long-term treatment program in order to effectively address her emotional, mental and drug-dependency problems. Even if S.P. were to work diligently and consistently toward resolving these issues, an outpatient program would likely take at least three years to bring S.P. to a level of satisfactory emotional and mental health.

¶24. It is not in the best interests of P.M. to wait that long for his mother to reorganize her chaotic world. P.M. is a child who needs order, structure, consistency and reliability in a parent. Although there is clearly a consensus among all of the health care professionals who have dealt with S.P. and P.M. that S.P. dearly loves her child, there is an equally unanimous belief that S.P. is not fit to parent this child at this time and will not be fit to do so at anytime in the foreseeable future.

¶25. Because there is clear and convincing evidence in the record that P.M. is a youth in need of care, that S.P. has not fulfilled the terms of her treatment plan, that the conditions which render S.P. unfit to parent are not likely to change within a reasonable period of time, and that P.M. has been in out-of-home placement for longer than one year, we conclude that the District Court did not err in terminating the parental rights of S.P. under the provisions of either § 41-3-609(e), MCA, or § 41-3-609(f), MCA.

¶26. Affirmed.

/S/ J. A. TURNAGE

We concur:

No

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER