No. 98-562

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 307N

IN THE MATTER OF K.H.K.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Marge Johnson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Ronald L. Bissell, Public Defender's Office; Great Falls, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Jennifer Anders,

Assistant Attorney General; Helena, Montana

Brant Light, Cascade County Attorney; Sam Harries,

Deputy County Attorney; Great Falls, Montana

Submitted on Briefs: July~15, 1999

Decided: December 7, 1999

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 This is an appeal by K.H.K.'s father from an order issued by the Eighth Judicial District Court, Cascade County, terminating his parental rights. The issue presented on appeal is whether the District Court erred in determining that the father was unfit to adequately parent K.H.K. and in determining that the conduct or condition rendering him unfit was unlikely to change within a reasonable time. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Department of Public Health and Human Services (DPHHS) first became involved with K.H.K.'s parents upon receiving referrals prior to K.H.K.'s birth. These referrals indicated that K.H.K.'s mother was drinking and using drugs during her pregnancy; that she was refusing to eat properly; that she was not taking the medication prescribed for her mental illness; that she was not following through with prenatal care; that K.H.K.'s father was physically abusive; and that he had

suffered a brain injury at three years of age when his father severely beat him, which has left him with limited mental capacity.

¶4 Shortly after K.H.K.'s birth on March 24, 1996, DPHHS made a referral to Family Based Services to provide K.H.K.'s parents with in-home assistance in caring for the baby and developing parenting skills. However, after learning that K.H.K.'s mother had been hospitalized due to an overdose of medication and that K.H.K. had been staying with a paternal aunt most nights, on April 18, 1996, DPHHS removed K.H.K. from the home and placed her with the paternal aunt. K.H.K.'s removal was based on the rising stress levels in the home between K.H.K.'s parents; the mother not being stabilized on her medication and her recent overdose; the father's alleged alcoholism that had not been addressed; and the parents' failure to cooperate with Family Based Services during the two weeks the program had been in the home.

¶5 On April 22, 1996, the deputy county attorney for Cascade County filed a Petition for Temporary Investigative Authority and Protective Services on behalf of DPHHS. This petition was supported by an affidavit that concluded further investigation was necessary to assess the parenting ability of K.H.K.'s parents. Based on the evidence presented at the show cause hearings, which indicated the possibility of an occurrence that would place K.H.K. in danger of being neglected or harmed, the District Court granted temporary investigative authority for 90 days. While the District Court did not alter the placement arrangement with the paternal aunt, it directed that the parents' time with K.H.K. be maximized. In addition, the District Court ordered both parents to complete current chemical dependency evaluations, psychological evaluations, and parenting assessments.

¶6 At the conclusion of the status hearing held on July 16 and 18, 1996, the District Court appointed a guardian ad litem, ordered a specific treatment plan to be prepared, and requested that the parents' time with K.H.K. be maximized as much as possible. On September 3, 1996, a status conference was held and a review hearing was scheduled for September 19, 1996.

¶7 At the review hearing, the State requested a 90-day extension of the temporary investigative authority and that K.H.K.'s father submit to random urinalyses to test for alcohol or drug use. At the time of the review hearing, K.H.K.'s father had completed his chemical dependency evaluation and psychological evaluation. Conversely, K.H.K.'s mother had not made any progress toward completion of the treatment plan. However, both parents planned to attend parenting classes beginning in October. Based on the evidence presented, the District Court extended the temporary investigative authority for 90 days. With regard to the request for random urinalyses, the District Court noted that it had previously approved such testing for both parents when it had approved the treatment plan.

¶8 On November 7, 1996, another status hearing was conducted. At the time of this hearing, both parents had completed their chemical dependency evaluations and psychological evaluations and had been attending parenting classes. However, the instructor for the parenting classes had reported that either one or both of them had smelled of alcohol at one of the parenting classes. At this hearing, a social worker for DPHHS testified that DPHHS intended to file for temporary legal custody and let the parents begin their chemical dependency programs and complete their parenting classes.

¶9 On December 16, 1996, a deputy county attorney for Cascade County filed a Petition for Temporary Legal Custody of K.H.K. on behalf of DPHHS and requested the District Court declare K.H.K. to be a youth in need of care. Pursuant to § 41-3-401(2), MCA (1997), an adjudicatory hearing was held on January 14, 1997, in accordance with § 41-3-404, MCA (1997). Based on the testimony of the professionals who conducted the psychological evaluations and chemical dependency evaluations of the parents and the DPHHS social worker, the District Court adjudicated K.H.K. to be a youth in need of care and awarded DPHHS temporary legal custody for six months. In addition, the District Court approved the Treatment Plan for Temporary Legal Custody with regard to both parents and required that it be completed within six months.

¶10 A status conference was held on March 4, 1997. During that conference, the State announced its intention to file a petition for permanent legal custody and termination of parental rights. The basis for the State's decision was that K.H.K.'s mother had made no progress on her treatment plan, that K.H.K.'s father had continued to use drugs, and that K.H.K.'s father had anger control problems. The District Court requested the parties brief the issue of whether it would be legally permissible to terminate the father's parental rights if he fully complied with the treatment plan, but testimony and the psychological evaluation established that he is unable to independently care for his child.

¶11 On April 28, 1997, a deputy county attorney for Cascade County filed a Petition for Permanent Legal Custody and Termination of Parental Rights on behalf of DPHHS. This petition

was based on the length of time K.H.K. had been in foster care and the parents' failure to complete a court-ordered treatment plan. On June 26, 1997, K.H.K.'s father filed a response to the petition, pointing out his substantial compliance with the treatment plan and requesting a reasonable amount of time to successfully complete the treatment plan and demonstrate his parenting ability.

¶12 Following two days of trial testimony on June 26 and 27, 1997, the District Court took the matter under advisement to give the guardian ad litem, who was not in attendance at the trial, an opportunity to review the transcript and conduct any necessary follow up. In addition, the District Court directed the parents to continue to work on their treatment plans, to stay in touch with the social worker, and to follow all recommendations of their therapists and counselors.

¶13 After attending the District Court hearings and reviewing the trial transcripts, the guardian ad litem filed her report with the District Court on October 15, 1997. Placing K.H.K. as her first priority, the guardian ad litem stated that it would be best for K.H.K. to be placed permanently with her paternal aunt. The guardian ad litem based this recommendation on her home visits with the parents and discussions with various family members about past behaviors.

¶14 Upon receiving the guardian ad litem's report, the District Court scheduled a continuation of the hearing regarding permanent legal custody for December 18, 1997. At this hearing, the District Court noted that since K.H.K. had been adjudicated a youth in need of care and since the court-approved treatment plan had not been successful and the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time, it was necessary for the District Court to order termination of the parental rights. As a result, the District Court

terminated the parental rights of K.H.K.'s parents, awarded permanent legal custody to DPHHS, and scheduled a final review to be held in six months.

¶15 On May 14, 1998, the District Court entered its findings of fact, conclusions of law and order terminating the parental rights of K.H.K.'s parents. In addition, the District Court ordered the parents to participate in counseling with the paternal aunt to stabilize their relationship for the benefit of K.H.K. The District Court then set the matter for final review in November 1998, at which time DPHHS would present the permanent placement plan for K.H.K. to the District Court. K.H.K.'s father filed a notice of appeal on July 9, 1998, appealing the District Court's May 14, 1998, order terminating his parental rights. Consequently, this appeal only concerns the termination of the father's parental rights.

## STANDARD OF REVIEW

¶16 The standard of review with respect to a district court's decision to terminate parental rights is whether the district court's findings of fact are clearly erroneous and whether the district court's conclusions of law are correct. See In re Custody and Parental Rights of P.M., 1998 MT 264, ¶ 10, 291 Mont. 297, ¶ 10, 967 P.2d 792, ¶ 10.

## DISCUSSION

¶17 Did the District Court err when it determined that the father was unfit to adequately parent his child and the conduct or condition rendering him unfit was unlikely to change within a reasonable time?

¶18 K.H.K.'s father contends that the State failed to meet its burden of showing that his

unfitness was unlikely to change within a reasonable period under § 41-3-609(1)(e), MCA (1997). The State asserts the District Court correctly concluded that K.H.K.'s father was unfit, unwilling, or unable to provide adequate parental care and that the condition rendering him unfit was not likely to change within a reasonable time.

¶19 The Parent-Child Legal Relationship Termination Act of 1981 provides procedures and criteria by which the parent-child legal relationship may be terminated by a court if the relationship is not in the best interest of the child. See § 41-3-601, et seq., MCA (1997). Section 41-3-609, MCA, specifically sets forth the criteria for the termination of parental rights:

Criteria for termination. (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.

Section 41-3-609(1), MCA (1997).

¶20 Section 41-3-609(2), MCA, sets forth the criteria for determining whether the conduct or

condition of the parents rendering them unfit is unlikely to change within a reasonable time:

[T]he court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

(b) a history of violent behavior by the parent;

.........

(d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

. . . ...

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions.

Section 41-3-609, MCA (1997).

¶21 The adjudication of K.H.K. as a youth in need of care is not in dispute. However, K.H.K.'s father does contest the termination of his parental rights on the basis that he substantially complied with the treatment plan and that the State has failed to demonstrate the conduct or condition

rendering him unfit was unlikely to change within a reasonable time. However, as this Court has previously recognized, "mere compliance with the treatment plan is not enough." In the Matter of the Custody and Parental Rights of F.M. (1991), 248 Mont. 358, 363, 811 P.2d 1263, 1267. Montana law requires that the treatment plan be successful. See § 41-3-609(1)(e)(i) and (f), MCA (1997).

¶22 Several witnesses, including health care professionals, a social worker, and relatives, testified regarding K.H.K.'s father's antisocial personality disorder, intellectual impairment due to a brain injury inflicted upon him at a young age by his own father, alcohol abuse, aggressive behavior, and lack of understanding regarding the developmental needs of a child. In addition, the clinical psychologist who conducted K.H.K.'s father's psychological evaluation stated in her report that K.H.K. would be at high risk for physical abuse and neglect if the father were K.H.K.'s caretaker and testified that the father's potential for change was very low.

¶23 In reaching its decision, the District Court noted that K.H.K.'s father's desire to parent his child was limited by the brain damage he suffered as a result of the physical abuse inflicted on him by his own father. Based on the father's history and unsuccessful compliance as well as his permanent disabilities, the District Court concluded that the conduct or condition rendering him unfit was unlikely to change within a reasonable time. In addition, despite his best efforts and the efforts of protective services personnel to rehabilitate him, the District Court determined that K.H.K.'s father was unfit, unwilling, or unable to provide adequate parental care, which resulted in the termination of his parental rights.

¶24 The record contains substantial credible evidence to support the District Court's determination that the treatment plan was not successfully completed. In addition, we determine that the District Court did not err when it concluded that K.H.K.'s father's lack of fitness was unlikely to change within a reasonable time. Therefore, we affirm the District Court's order terminating the parental rights of K.H.K.'s father.

¶25 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER