No. 00-331

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 51

IN THE MATTER OF J.M., JR.,

Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin T. Sweeney, Sweeney & Healow. Billings, Montana

For Respondents:

Patrick Kenney, Attorney at Law, Billings, Montana

(Guardian ad litem for J.M., JR.)

Submitted on Briefs: November 30, 2000
Decided: April 5, 2001

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Darlyn, the birth-mother of J.M., appeals from the Findings of Fact and Conclusions of Law issued by the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights with respect to J.M. Darlyn contends that the District Court relied upon inadmissible evidence. We affirm.

## BACKGROUND

¶2 J.M. was born on April 13, 1998. The Department of Public Health and Human Services ("DPHHS") received a referral regarding J.M.'s birth indicating that Darlyn, J. M.'s mother, had a prior history with DPHHS and that she and J.M.'s birth father had intellectual disabilities. A little more than two weeks after J.M.'s birth, on April 29, 1998, the State filed a Petition for Temporary Investigative Authority and Emergency Protective Services with regard to J.M. In a Report to the Court, DPHHS informed the court that Darlyn had been placed in foster care in 1982 and had become pregnant by her step-father at a very young age. DPHHS also informed the court that J.M.'s father had been convicted of indecent liberties with a minor and had refused sex offender treatment while incarcerated. J.M. was removed from his parent's care immediately following his release from the hospital.

¶3 DPHHS entered into treatment plans with both parents on June 10, 1998. The parents entered a second treatment plan on October 28, 1998, and a third treatment plan on January 19, 1999. On April 27, 1999, the State petitioned the court to terminate the parents' rights with respect to J.M. On March 24, 2000, the court issued its Findings of Fact, Conclusions of Law and Order terminating the birth parents' parental rights with respect to J.M. and granting DPHHS custody of J.M. The court concluded that the parents had not complied with the treatment plans and that their condition and conduct rendered them unfit or unable to provide J.M. with adequate care. Darlyn appeals.

## STANDARD OF REVIEW

¶4 We review trial court evidentiary rulings to determine whether the court abused its discretion. *Estate of Silver*, 2000 MT 127, ¶ 16, 296 Mont. 506, ¶ 16, 1 P.3d 358, ¶ 16.

## DISCUSSION

¶5 Did the District Court abuse its discretion when it admitted evidence of the parents' interaction with a "Baby Think It Over" doll?

¶6 During the September 23, 1999, hearing on the State's petition to terminate parental rights, the State called Ron Walters, a DPHHS social worker who had been involved in J. M.'s case from May 1998 to April 1999. Walters testified that on October 26, 1998, DPHHS provided the parents with a "Baby Think It Over" doll. Walters stated that the doll contains a control module which simulates a baby's needs by crying and requiring care and is used to teach parents about the time demands of a baby. If the doll's "parent" does not insert a key and tend to the doll when the doll cries, the doll registers the incident as a neglect incident and records the total minutes of unattended crying. The control module is also programmed to respond to violent shaking or impact and records such episodes as "abuse incidents."

¶7 As Walters began to testify about the results of J.M.'s parents' interaction with the "Baby Think It Over" doll, defense counsel for both parents raised objections. Darlyn's counsel argued that the State had not supplied sufficient foundation for the reliability of the doll. J.M.'s father's counsel argued that the failure rate of these dolls had not been provided. The State's attorney and J.M.'s guardian ad litem responded that the doll was not being introduced as a scientific investigation, but rather was information used by DPHHS to affirm or deny its concerns regarding the parenting abilities of J.M.'s parents and that the court could determine the value of the testimony. The court admitted Walters' testimony regarding the parents' interaction with the doll.

¶8 Walters testified that the parents had the doll from October 26 to October 29, 1998, without recording any abuse or neglect incidents. Walters stated that the parents' final visitation with the doll occurred on November 2, 1998. According to Walters, the control module recorded no neglect incidents but did record one abuse incident. Walters testified that the doll records a sharp blow or impact as an abuse incident. He discussed the incident with J.M.'s parents, who had no explanation for the incident. Walters was then asked whether there had been any problems with that particular doll or any erroneous recordings of such incidents. Walters responded, "Not to my knowledge. The doll belonged to Kathy Fox, and they [sic] had reported no problems."

¶9 In its order terminating parental rights, the District Court stated:

At the end of October 1988, the parents were provided with a "Baby Think it Over"

doll, which is an infant simulator used in local high school parenting classes. It records incidents of neglect and significant abuse if not tended to. The simulator recorded an incident of abuse on November 2, 1998. The parents had no explanation for this. The doll did not show that it had been tampered with, and it had no problems with malfunctions after that time. At that time, the parents had completed over two months of hands-on parenting training. The infant simulator is by no means the sole basis of determining parenting abilities as it measures only a parent's ability or willingness to respond to an infant's time demands. It cannot measure other important things such as ability to feed a child, ability to assist the child in his development, nurturing, or other items important to parenting.

¶10 On appeal, Darlyn contends that the District Court erred when it admitted evidence regarding the "Baby Think It Over" doll. She argues that the State failed to provide sufficient foundation for the admission of this evidence, such as whether the doll was properly functioning at the time it was used and whether the results were reliable. Darlyn claims that this evidence is analogous to the results of polygraph examinations which have been held inadmissible due to their unreliability. The State offers no argument concerning the admissibility of evidence of the parents' interaction with the "Baby Think It Over" doll.

¶11 The disputed testimony regarding the "Baby Think It Over" doll can be summed up as follows: The doll recorded an abuse incident. An abuse incident consists of an incident in which the doll suffered a sharp blow. The parents offered no explanation for the fact that the doll recorded an abuse incident. Lastly, Walters was not aware that the doll had ever malfunctioned.

¶12 We decline to address Darlyn's contention that testimony concerning the "Baby Think It Over" doll should be inadmissible as a matter of law because it is somehow analogous to a polygraph examination. However, we will address Darlyn's contention that the State failed to provide sufficient foundation for the admission of this evidence.

¶13 Evidence which is not relevant is not admissible. Rule 402, M.R.Evid. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid. Therefore, evidence that the doll recorded an abuse incident was admissible if it tended to make the existence of a consequential fact more probable. *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 401.04(2)(b) (Joseph M. McLaughlin, ed., 2d ed. 2000)

(stating that "[t]he question to be asked in determining the relevance of evidence is whether a reasonable person might believe the probability of the truth of the consequential fact to be different if that person knew of the proffered evidence").

¶14 What consequential fact was the State attempting to establish by introducing testimony that the "Baby Think It Over" doll recorded an incident of abuse? The State's petition for termination alleged that the parents had not complied with their treatment plans and that the treatment plans were not successful. The State also alleged that the conduct or condition rendering the parents unfit, unable or unwilling to give J.M. adequate parental care appeared unlikely to change within a reasonable time. The doll's recordation of an abuse incident would only tend to establish these consequential facts if the State had supplied the court with a reason to believe that the doll's recordation of an abuse incident reflected the actual occurrence of abuse by one of the parents. However, the only evidence the State presented regarding the doll's reliability was the following colloquy between Walters and counsel for the State:

> Q. Have there been any other problems with that doll or [evidence of the doll] falsely or erroneously recording such incidents?
>
> A. Not to my knowledge. The doll belonged to Kathy Fox, and they [sic] had reported no problems.

¶15 The State did not supply sufficient foundation for the admission of testimony regarding the abuse incident recorded by the "Baby Think It Over" doll because the State failed to produce evidence of the doll's reliability. Given the scarcity of the State's evidence regarding the doll's reliability, it would be just as reasonable for the court to assume that the doll simply malfunctioned. Therefore, the fact that the doll recorded an incident of abuse was irrelevant and thus inadmissible. It was not probative of the fact that the parents' treatment plans were not successful nor was it probative of the fact that the conduct or condition rendering them unfit was unlikely to change. We hold that the District Court abused its discretion in admitting this testimony.

¶16 An abuse of discretion in an evidentiary ruling, however, does not necessarily constitute reversible error. *In re A.N.*, 2000 MT 35, ¶ 55, 298 Mont. 237, ¶ 55, 995 P.2d 447, ¶ 55. We have repeatedly stated that "no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless." *In re A.N.*, ¶ 39. We have also stated that "a

reversal cannot be predicated upon an error in admission of evidence, where the evidence in question was not of such character to have affected the result." *In re A.N.*, ¶ 55.

¶17 Darlyn maintains that the admission of this evidence should be considered reversible error because the District Court specifically referred to it in its findings of fact. Darlyn also argues that the introduction of this evidence was "fundamentally unfair." The State responds that there is an overwhelming abundance of evidence in the record supporting the District Court's decision to terminate parental rights.

¶18 We do not believe that the admission of this evidence was "fundamentally unfair" nor do we believe that its admission constituted reversible error simply because the court referred to it in its findings of fact. Rather, the issue is whether the error had a "significant impact upon the result." *In re A.N.*, ¶ 39. We agree with the State that the evidence did not have a significant impact upon the court's termination of parental rights. The State offered the court with an abundance of evidence demonstrating that Darlyn's parenting abilities were inadequate.

¶19 The court may order termination of the parent-child legal relationship upon a finding that the child is an adjudicated youth in need of care and both of the following exist: (1) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (2) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. Section 41-3-609, MCA. The burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. *In re P.M.,* 1998 MT 264, ¶ 12, 291 Mont. 297, ¶ 12, 967 P.2d 792, ¶ 12. We review a district court's finding that the State demonstrated by clear and convincing evidence that the statutory criteria governing the termination of parental rights were satisfied to determine whether that finding was clearly erroneous. *In re A.N.*, ¶ 22.

¶20 The State presented sufficient evidence to support the determination that Darlyn's court approved treatment plans were neither complied with nor successful. For instance, Merry Richmond, a DPHHS social worker who was assigned to Darlyn's case in May 1999, testified that Darlyn did not successfully comply with her treatment plans because she did not prove that she was capable of providing a safe and stable family environment or providing minimally adequate parenting. Richmond agreed that Darlyn was consistently choosing a relationship with a sex offender who refused treatment even though she knew it could result in the termination of her parental rights. Richmond believed that Darlyn was

willing to put her child at risk.

¶21 The State presented sufficient evidence to support the determination that the conduct or condition of Darlyn rendering her unfit is unlikely to change within a reasonable time. For instance, Dr. Donna Veraldi, a clinical psychologist who performed a psychological evaluation of Darlyn, stated that Darlyn had a history of trauma and cognitive delays and that it is hard for her to identify problems and to find solutions to problems.

¶22 We hold that the District Court properly determined that Darlyn had not successfully complied with her treatment plans and that the conduct or condition rendering Darlyn unfit to parent J.M. was not likely to change within a reasonable time. Accordingly, we hold that, although the District Court abused its discretion in admitting testimony concerning the "Baby Think It Over" doll, that error was harmless.

¶23 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART