No. 98-336

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 11

298 Mont. 41

994 P.2d 37

---

IN RE THE MATTER OF J.H.,

Youth in Need of Care.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin Gillen, Gillen Law Office, P.C.; Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Mark W. Mattioli,

Assistant Attorney General; Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Melanie Logan,

Deputy County Attorney; Billings, Montana

Damon Gannett, Attorney at Law (guardian ad litem); Billings,

Montana

Submitted on Briefs: August 26, 1999

Decided: January 20, 2000

Filed:

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1.This is an appeal by J.H.'s mother from findings of fact and conclusions of law entered by the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights. We affirm.

¶2.The issues presented on appeal are as follows:

¶3. Did the District Court err when it concluded that the treatment plans drafted by the Department of Public Health and Human Services were not successful?

¶4. Did the District Court err when it terminated the mother's parental rights rather than awarding temporary custody to the Department of Public Health and Human Services pending her release from prison?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5.The Department of Public Health and Human Services (DPHHS) in Yellowstone County first became involved with J.H.'s mother in June 1992 when it received reports that she was abusing drugs and alcohol, which led to the neglect of her first child. After

she was arrested for forgery, her first child was placed in foster care on June 4, 1992. Subsequently, the DPHHS petitioned for temporary investigative authority and provided J. H.'s mother with a treatment plan to be implemented upon her release from jail.

¶6.In October 1992 J.H.'s mother, pregnant with her second child, moved in with her parents in Fergus County. At that point, her first child was removed from foster care and placed with her in her parents' home. During the time J.H.'s mother resided with her parents, she participated in parenting classes and counseling, which raised some concerns regarding her ability to adequately parent a child. In March 1993 her second child was placed in a foster home shortly after birth. Following her second child's placement in a foster home, J.H.'s mother considered relinquishing her parental rights with regard to her two children.

¶7.In August 1993 J.H.'s mother took her oldest child and left the state without permission and without proper medication to treat her child's juvenile arthritis. The child's maternal grandmother flew to California and returned to Montana with the child. On September 30, 1993, J.H.'s mother's parental rights to her two children were terminated due to her failure to complete court-approved treatment plans.

¶8.In 1994 J.H.'s mother was sentenced to one year in jail and four months in prison for her crimes. In December 1996 the DPHHS received a report that J.H.'s mother was pregnant with her third child, J.H. The person making the report noted that J.H.'s mother's lifestyle, behavior and choices had not changed in the last five years.

¶9.In March 1997 J.H.'s mother was incarcerated in the Women's Correctional Facility in Billings for violating her parole by leaving the state, changing her residence, quitting her job, and failing to report to her probation officer. On March 7, 1997, she gave birth to J.H. J.H. was placed in an emergency foster home for three weeks and has been in a legal risk adoptive placement ever since.

¶10.Following the birth of J.H., J.H.'s mother stated that she would do whatever the DPHHS asked of her and that she hoped to be released from prison within 120 days. Nevertheless, J.H.'s mother told a DPHHS social worker that if she had to remain in prison for a year, she would sign relinquishment waivers and allow J.H. to be adopted.

¶11.On March 11, 1997, a deputy county attorney for Yellowstone County filed a Petition for Temporary Investigative Authority and Protective Services on behalf of the DPHHS.

The petition was based on the March 11, 1997, report of a DPHHS social worker. The DPHHS asserted that J.H. was dependent, abused, or neglected within the meaning of § 41-3-102, MCA (1997). Based on the petition and the social worker's report, the District Court granted temporary investigative authority for a period of 90 days and scheduled a show cause hearing for March 31, 1997. Neither of J.H.'s parents attended the show cause hearing on March 31, 1997. At the conclusion of the hearing, the District Court ratified and confirmed its previous order granting temporary investigative authority for 90 days.

¶12.The DPHHS entered into a treatment plan with J.H.'s mother, covering the period of March 21, 1997, to June 1, 1997, which was signed by J.H.'s mother on May 13, 1997, and approved by the District Court on May 16, 1997. On May 30, 1997, a deputy county attorney for Yellowstone County made a motion on behalf of the DPHHS to extend the temporary investigative authority for an additional 90 days. This motion was based on the May 28, 1997, report of a DPHHS social worker. This report indicated that J.H.'s mother was cooperating with the DPHHS social worker regarding visits with J.H. and completing the tasks identified in the treatment plan that could be completed while she was incarcerated.

¶13.Neither of J.H.'s parents attended the June 16, 1997, hearing on the motion for extension of the temporary investigative authority. At the conclusion of the hearing, the District Court ordered counsel to prepare an order for court-appointed counsel for the parents. On June 23, 1997, the District Court, noting that the motion for extension had been unopposed, granted the extension of the temporary investigative authority for an additional 90 days, until September 8, 1997, to permit further investigation.

¶14.In July 1997, J.H.'s mother went before the parole board. She was denied parole on that occasion, but was placed on annual review. In addition, a new parenting program was instituted at the prison in the summer of 1997. J.H.'s mother was a volunteer with the program from its inception at the prison.

¶15.On September 8, 1997, a deputy county attorney for Yellowstone County filed a Petition for Permanent Legal Custody, Termination of Parental Rights and Right to Consent to Adoption on behalf of the DPHHS. In this petition, the DPHHS claimed that the treatment plans had not been complied with or had not been successful and that the conduct or condition rendering J.H.'s mother unfit, unable or unwilling to provide J.H. with adequate parental care appears unlikely to change within a reasonable time. The DPHHS also claimed that continuation of the parent-child relationship would likely result

in continued abuse or neglect of J.H. and that the best interests of J.H. would be served by terminating the parental rights of her parents and awarding permanent legal custody to the DPHHS with authority to consent to adoption.

¶16. On September 15, 1997, the District Court scheduled a hearing regarding the petition for permanent legal custody for December 8, 1997. Following the December 8, 1997, hearing, the DPHHS entered into another treatment plan with J.H.'s mother, covering the period of December 15, 1997, to February 15, 1998, which was signed by J.H.'s mother on December 19, 1997, and approved by the District Court on January 24, 1998.

¶17. Due to an insufficient amount of time within which to complete the December 8, 1997, hearing, it was continued until February 10, 1998. J.H.'s mother was present at both of these hearings and testified at the February 10, 1998, hearing. At the conclusion of the hearing on February 10, 1998, the District Court requested the parties to submit proposed findings of fact and conclusions of law.

¶18. On March 4, 1998, the District Court entered its findings of fact and conclusions of law. The District Court adopted findings from those proposed by both the DPHHS and J. H.'s mother, as well as made additional findings. The District Court declared J.H. to be a youth in need of care pursuant to § 41-3-102, MCA (1997), and concluded that it was in J. H.'s best interests to terminate the parental rights of her parents. In so doing, the District Court determined that the treatment plans were not complied with and were not successful and concluded that J.H.'s mother was unable or unwilling to provide J.H. with adequate parental care. In reaching its decision, the District Court gave primary consideration to the physical, mental, and emotional needs of J.H.

¶19. The District Court entered judgment terminating the parental rights of J.H.'s parents on March 6, 1998. J.H.'s mother appeals from the District Court's findings of fact and conclusions of law. J.H.'s father has never seen J.H., parented her, or expressed an interest in doing so, and has denied that he is her father. In addition, J.H.'s father did not participate in the District Court proceedings. Consequently, this appeal only concerns the termination of J.H.'s mother's parental rights.

## STANDARD OF REVIEW

¶20. The standard of review with respect to a district court's decision to terminate parental rights is whether the district court's findings of fact are clearly erroneous and whether the

district court's conclusions of law are correct. *See In re Custody and Parental Rights of P. M.*, 1998 MT 264, ¶21.10, 291 Mont. 297, ¶22. 10, 967 P.2d 792, ¶23.10.

## ISSUE 1

¶24.Did the District Court err when it concluded that the treatment plans drafted by the Department of Public Health and Human Services were not successful?

¶25.J.H.'s mother asserts that an objective view of the evidence indicates that the treatment plans were successful. While the DPHHS concedes that J.H.'s mother substantially complied with the treatment plans, it contends that the treatment plans were unsuccessful in two respects. First, J.H.'s mother did not improve her parenting skills to the point where she could assume parental care even if she were not incarcerated. Second, J.H.'s mother's long-term confinement precluded the possibility that she would be logistically able to parent J.H. within a reasonable time. The District Court concluded that the treatment plans were appropriate for the needs of the family, that they were not complied with, and that they were not successful. The District Court went on to state that J.H.'s mother was unable or unwilling to provide J.H. with adequate parental care and that her conduct and condition had not improved over the past years and were unlikely to change within a reasonable time.

¶26.This Court has previously recognized that mere compliance with a treatment plan is not enough. *See In the Matter of the Custody and Parental Rights of F.M.* (1991), 248 Mont. 358, 363, 811 P.2d 1263, 1267. Montana law requires the treatment plan to be successful. *See* § 41-3-609(1)(e)(i) and (f), MCA (1997).

¶27.In this case, the two treatment plans approved by the District Court for J.H.'s mother covered a period of approximately four and one-half months. The first treatment plan covered a period of approximately two and one-half months from March 21, 1997, to June 1, 1997, and listed the following goals: (1) to assist J.H.'s mother in stabilizing her environment; (2) to assist J.H.'s mother in improving her relationship with J.H.; and (3) to provide the DPHHS with the necessary information for determining whether the child will be returned to J.H.'s mother's home. The second treatment plan covered a period of approximately two months from December 15, 1997, to February 15, 1998, and listed the following goals: (1) demonstrate competence in all areas of parenting; (2) establish a stable financial status while incarcerated so that J.H.'s basic needs can be met; and (3) assess whether J.H.'s mother has made sufficient progress in her psychological/emotional

functioning.

¶28.A DPHHS social worker testified that at the time the first treatment plan was offered to J.H.'s mother, the DPHHS had an understanding, based on information provided by J.H.'s mother, that she would be released from prison in June 1997. However, there is no indication in the record that anyone from the DPHHS verified when J.H.'s mother would actually be eligible for release. Instead, the DPHHS offered J.H.'s mother another short-term treatment plan based on what the DPHHS social workers thought the child needed.

¶29.Several witnesses, including a probation and parole officer, a DPHHS social worker, and persons involved with the parenting program at the prison, testified that J.H.'s mother had made significant efforts to comply with the treatment plans, but the treatment plans were not successful in rehabilitating her to adequately parent J.H. Despite J.H.'s mother's substantial compliance with the treatment plans, the short-term treatment plans were not successful as a result of her extended incarceration. Therefore, we conclude that the District Court did not err when it determined that the treatment plans were not successful.

¶30.However, we feel it is important to note that this case raises concerns regarding the DPHHS' approaches and procedures. *See Matter of J.S. & P.S.* (1994), 269 Mont. 170, 178-79, 887 P.2d 719, 724 (Gray, J., specially concurring). As Justice Gray pointed out in the *Matter of J.S. & P.S.*, "[a] treatment plan is intended to be a good faith, joint effort by both the [DPHHS] and the parent to preserve the parent-child relationship and the family unit." 269 Mont. at 178-79, 887 P.2d at 724. Here, the mother was offered two short-term treatment plans while she was incarcerated and was led to believe that if she complied with these plans she would be able to parent J.H. upon her release from prison. A DPHHS social worker testified that the short time frame for the treatment plans was due to representations made by J.H.'s mother regarding when she expected to be released. There was no indication in the record that the DPHHS conducted any follow up investigation to determine when J.H.'s mother would actually be eligible for release and what the conditions of her release would be. In the end, what mattered to the District Court was the length of time the child had been in foster care and that the child had bonded with the foster family. However, based on the short-term nature of the treatment plans, which were signed by J.H.'s mother and approved by the District Court, and J.H.'s mother's extended incarceration, we cannot conclude that the District Court erred in determining the treatment plans were not successful.

ISSUE 2

¶31.Did the District Court err when it terminated the mother's parental rights rather than awarding temporary custody to the Department of Public Health and Human Services pending her release from prison?

¶32.J.H.'s mother contends that there is no basis in law or fact to support the District Court's findings and conclusions that she could not adequately care for J.H. once she is discharged from the prerelease program. J.H.'s mother points to the fact that she has never been given an opportunity to parent J.H. since J.H. was placed in foster care at birth. J.H.'s mother also alleges that inconsistencies between the findings of fact and conclusions of law suggest that her parental rights were terminated solely due to her incarceration and not to any abuse or neglect.

¶33.The DPHHS counters by asserting that the primary objective of the two treatment plans was to develop J.H.'s mother's parenting skills to the point where she could assume the responsibilities of parenthood. The DPHHS claims that an implied condition precedent to meeting this goal was the need for J.H.'s mother to be released from her penal obligations so that she would be in a position to begin parenting J.H. While the DPHHS commends J.H.'s mother's efforts to improve her parenting skills, it contends that these efforts were not sufficient to demonstrate that the treatment plans were successful.

¶34.Based on the evidence and testimony presented, the District Court found that J.H.'s mother would not be released from the Women's Correctional Facility until at least July 1998 and that upon her release she would be required to successfully complete a six- to nine- month prerelease program, during which she would not be allowed to parent a child. In addition, the court found that it would take a substantial amount of time to transition J. H., who is very attached to her foster parents, back into the sole care of her biological mother. The District Court also noted that the people working with J.H.'s mother in the parenting program at the prison testified that she has a limited ability to recognize the child's needs and to pick up on cues from the child. Giving primary consideration to J.H.'s physical, mental and emotional needs, the District Court concluded that it would be in J. H.'s best interests to terminate the parent-child relationship between J.H. and her parents.

¶35.Section 41-3-609, MCA (1997), specifically identifies the criteria for the termination of parental rights:

**Criteria for termination. (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:**

. . . .

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; or

(f) the parent has substantially failed to successfully complete or meet the goals of a treatment plan approved by the court and the child has been in an out-of-home placement for a cumulative total period of 1 year or longer.

Section 41-3-609(1), MCA (1997).

¶36.To terminate parental rights based upon § 41-3-609(e), MCA (1997), a court must adjudicate the child to be a youth in need of care, determine that an appropriate treatment plan has not been complied with or has not been successful, and determine that the conduct or condition of the parent rendering her unfit is unlikely to change within a reasonable time. The adjudication of J.H. as a youth in need of care is not in dispute and we have already determined that the treatment plans were not successful. Therefore, we turn our attention to the final element required for termination of parental rights under § 41-3-609(e), MCA (1997).

¶37.Section 41-3-609(2), MCA, sets forth the criteria for determining whether the conduct or condition of the parent rendering her unfit is unlikely to change within a reasonable time:

[T]he court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect *or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care*. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and

emotional needs of the child within a reasonable time;

(b) a history of violent behavior by the parent;

. . . .

(d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

(e) present judicially ordered long-term confinement of the parent;

. . . .

(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, *the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child*. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental, and emotional conditions.

Section 41-3-609, MCA (1997) (emphasis added).

¶38. In reaching its decision, the District Court considered J.H.'s mother's possible long-term confinement as well as all reasonable efforts by protective services to rehabilitate her. In doing so, the District Court relied on the evidence and testimony presented regarding J. H.'s mother's parenting skills, the length of her incarceration, and J.H.'s bonding with the foster family since her placement with them three weeks after her birth in March 1997. As a result, the District Court concluded that the conduct or condition rendering J.H.'s mother unfit to parent J.H. was unlikely to change within a reasonable time.

¶39. The District Court properly gave primary consideration to the physical, mental, and emotional needs of J.H. pursuant to § 41-3-609(3), MCA (1997), and determined that it would be in J.H.'s best interests to terminate the parental rights of her parents. Based on the length of incarceration, the completion of a six- to nine-month prerelease program, a lengthy transition period, and the level of J.H.'s mother's parenting skills, we conclude that the District Court did not err when it terminated J.H.'s mother's parental rights rather than awarding temporary custody to the DPHHS pending her release. Due to the length of time

J.H. would be required to spend with the foster family until her mother's release and completion of a prerelease program as well as the level of bonding that had occurred between J.H. and her foster family, necessitating an additional transition period, J.H.'s mother's substantial compliance with the treatment plans cannot defeat the statutory mandate requiring the court to give primary consideration to the child's physical, mental and emotional needs. Therefore, we conclude that the District Court did not err when it terminated J.H.'s mother's parental rights rather than awarding temporary custody to the DPHHS pending her release.

¶40.Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY