No. 01-283

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 131

IN THE MATTER OF

J.J. & C.J.,

Youths in Need of Care.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Carl Jensen, Great Falls, Montana (mother); Ronald Bissell, Great Falls, Montana (child)

For Respondent:

Mike McGrath, Montana Attorney General, Ilka Becker, Assistant Montana Attorney General, Helena, Montana; Brant S. Light, Cascade County Attorney, Susan Brooke, Deputy Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: June 29, 2001
Decided: July 25, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 L.B., the natural mother of J.J. and C.J., appeals an order of the District Court for the Eighth Judicial District, Cascade County, terminating her parental rights. We affirm.

¶2 We address the following issue on appeal: Whether the District Court erred when it terminated L.B.'s parental rights based on the State's argument that L.B. had abandoned the children.

## Factual and Procedural Background

¶3 L.B. and W.J., the parents of J.J. and C.J., separated in 1993. L.B. gave custody of J.J., born October 5, 1990, and C.J., born April 9, 1992, to W.J. so that L.B. could begin a chemical dependency program. L.B. has not parented the children since February 1994. In fact, L.B. moved to Oregon and had no contact with her children for almost six years.

¶4 The Department of Public Health and Human Services (DPHHS) first became involved with the family in 1994 based on alleged physical abuse of J.J. by W.J. As a result, the children were removed from W.J.'s custody. A treatment plan was adopted for each parent, but L.B. failed to complete hers. W.J. successfully completed his treatment plan and the children were returned to his care in January 1996.

¶5 DPHHS commenced the present case in February 1999 when it received a report that the home was infested with "bed bugs" and that the children had multiple bites. It was also alleged that W.J. and his friends frequently used drugs in the home and that W.J. hit one of the children with a belt. In an interview with a social worker, the children corroborated the allegations of drug use by describing a "horrible smell coming from the basement" and finding syringes and a round bowl-like apparatus with a tube attached to it. The social worker notified law enforcement officers and a subsequent search of the home produced evidence of a methamphetamine lab.

¶6 W.J. was taken into custody in March 1999. He pleaded guilty to felony accountability for the criminal production and manufacture of dangerous drugs and was sentenced to ten years at Montana State Prison with six years suspended. During his incarceration, W.J. has maintained contact with his children including visits at the prison and weekly telephone calls.

¶7 When the children were taken into protective custody after their father's arrest, they complained of having a "hungry tummy most of the time" raising concerns of malnutrition. The children also disclosed that W.J. had physically abused them. Consequently, on June 15, 1999, the court declared the children youths in need of care, pursuant to § 41-3-102, MCA, and granted DPHHS legal custody of the children for six months. On January 4, 2000, the court approved a treatment plan for W.J. and extended the order for temporary legal custody for another six months.

¶8 After DPHHS filed for temporary legal custody of the children in March 1999, L.B. contacted DPHHS to ask if she would be considered a placement option. However, DPHHS had no further contact from her until April 3, 2000, more than one year after the children were placed in foster care. And, although there had been several hearings regarding the children's welfare from the time they were placed into DPHHS's custody in March 1999, L.B. failed to attend any of them.

¶9 On June 18, 2000, L.B. signed a document entitled "Case Plan Recommendations." The "case plan" contained the following five recommendations: (1) that L.B. complete a psychological evaluation; (2) that L.B. attend a domestic violence support group; (3) that L.B. acquire her own residence; (4) that L.B. obtain a chemical dependency evaluation; and (5) that L.B. complete a parenting assessment and parenting classes.

¶10 On June 21, 2000, the State petitioned for permanent legal custody and termination of parental rights as to both L.B. and W.J. The State alleged that L.B. had abandoned her children; that the children had been in an out-of-home placement for longer than one year and that the parents neglected to remedy the circumstances that caused the out-of-home placement; and that W.J. failed to successfully complete a court-approved treatment plan.

¶11 The hearing on the State's petition for permanent legal custody and termination of parental rights was held on October 31, 2000. L.B. was present with her attorney. W.J. was not present because his attorney failed to request a transport order. The District Court reopened the hearing on January 9, 2001, to afford W.J. the opportunity to appear.

¶12 On March 12, 2001, the District Court entered an order wherein it determined that it would be appropriate to hold the case open as to W.J., pending his upcoming parole hearing, because he had substantially complied with his treatment plan and had maintained contact with his children while incarcerated. As to L.B., the court determined that she had abandoned the children and that, under the circumstances, DPHHS was not required to provide a treatment plan for her. Consequently, the court terminated L.B.'s parental rights. L.B. appeals the District Court's order terminating her parental rights.

## Discussion

¶13 *Whether the District Court erred when it terminated L.B.'s parental rights based on the State's argument that L.B. had abandoned the children.*

¶14 We review a district court's decision to terminate parental rights for whether the court's findings of fact are clearly erroneous and whether the court's conclusions of law are correct. *In Re J.H.*, 2000 MT 11, ¶ 20, 298 Mont. 41, ¶ 20, 994 P.2d 37, ¶ 20 (citations omitted). Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or this Court's review of the record convinces it that a mistake has been made. *In Re M.J.W.*, 1998 MT 142, ¶ 7, 289 Mont. 232, ¶ 7, 961 P.2d 105, ¶ 7 (citations omitted).

¶15 We have long recognized that

> a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures. Consequently, prior to terminating an individual's parental rights, the district court must adequately address each applicable statutory requirement. Further, the party seeking termination of an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met.

*In Re C.A., 2000 MT 227, ¶ 5, 301 Mont. 233, ¶ 5, 8 P.3d 116, ¶ 5 (internal quotations and citations omitted).*

¶16 To terminate the parent-child legal relationship, a district court must determine that one of the criteria in § 41-3-609(1), MCA, exists. *M.J.W.*, ¶ 16 (citing *In Re Declaring D. H.* (1994), 264 Mont. 521, 526, 872 P.2d 803, 806). Section 41-3-609(1), MCA, provides in pertinent part as follows:

**Criteria for termination.** (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

(a) the parents have relinquished the child pursuant to 42-2-402 and 42-2-412;

(b) *the child has been abandoned by the parents;*

(c) the parent is convicted of a felony in which sexual intercourse occurred or is a minor adjudicated a delinquent youth because of an act that, if committed by an adult, would be a felony in which sexual intercourse occurred and, as a result of the sexual intercourse, the child is born;

(d) the parent has subjected the child to any of the circumstances listed in 41-3-403 (2)(a) through (2)(e);

(e) the putative father meets any of the criteria listed in 41-3-403(3)(a) through (3) (c); or

(f) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. [Emphasis added.]

"Abandoned" is defined in § 41-3-102(1), MCA, as:

(1) "Abandon", "abandoned", and "abandonment" mean:

(a) *leaving a child under circumstances that make reasonable the belief that the parent does not intend to resume care of the child in the future;*

(b) willfully surrendering physical custody for a period of 6 months and during that period not manifesting to the child and the person having physical custody of the child a firm intention to resume physical custody or to make permanent legal arrangements for the care of the child; or

(c) that the parent is unknown and has been unknown for a period of 90 days and that reasonable efforts to identify and locate the parent have failed. [Emphasis added.]

¶17 In its order terminating L.B.'s parental rights, the District Court determined that L.B. had not manifested to DPHHS or the children's caretaker any intention of resuming care or custody of the children. The court also determined that because L.B. had abandoned the children, DPHHS was not required to provide a treatment plan for her.

¶18 L.B. argues that the District Court erred in terminating her parental rights on the basis of abandonment. She maintains that she had resumed her involvement with her children and had begun a treatment plan. She argues that once she became involved, using abandonment to terminate her parental rights was in error. She maintains that she signed a treatment plan on June 18, 2000, but that she was not given the opportunity to complete the plan before the State moved for termination of her parental rights. She contends that the State conceded that it would take a minimum of six months to complete the plan, but that she was given only four months to do so.

¶19 Contrary to L.B.'s contentions, the District Court terminated her parental rights not because she did not complete a treatment plan, but because she had abandoned her children pursuant to § 41-3-609(1)(b), MCA. A treatment plan is not required upon a finding by the court that the parent has abandoned the child. Section 41-3-609(4)(a), MCA.

¶20 In addition, L.B.'s contention that she had begun a treatment plan but was not given the opportunity to complete it is in error. The "case plan" that she signed and returned to DPHHS in June 2000, was not a treatment plan that had been approved by a court as contemplated by § 41-3-609(1)(f), MCA. Moreover, L.B. acknowledged that it was not a treatment plan when her attorney asked the District Court to continue the termination hearing so that a treatment plan could be prepared for her.

¶21 Nevertheless, L.B.'s testimony regarding the "case plan" merely reinforces the court's conclusion that she abandoned the children. She signed the case plan in June 2000, but testified at the October 31, 2000 termination hearing that she had not begun work on any of the five recommendations. As the State pointed out in its brief on appeal, L.B.'s argument that she was not given sufficient time to complete the case plan is disingenuous. While the almost five months from the time L.B. signed the case plan on June 18, 2000, until the termination hearing on October 31, 2000, was not long enough to complete each

of the five recommendations, it was certainly long enough to begin work on some of the recommendations. L.B. failed to show that she had begun *any* work on the case plan.

¶22 In *M.J.W.*, we concluded that the father's failure to parent his daughter for any extended period of time, including his failure to visit her regularly while in foster care, made reasonable the belief of DPHHS that he did not intend to resume care of the child in the future. *M.J.W.*, ¶ 17. Similarly, L.B.'s failure to parent her children or even visit them for more than six years, particularly the last year when they were in the care of DPHHS, made reasonable the belief that L.B. did not intend to resume care of the children.

¶23 L.B. failed to meet her burden of establishing error by the trial court. In fact, her own testimony at the termination hearing supported the court's findings. L.B. testified that she had not had regular contact with the children since 1994; that she was aware of the criminal charges against W.J. and that the children were in the custody of DPHHS; that the October 31, 2000 termination hearing was the first court hearing she attended; that she had not previously come to Montana to discuss the children's situation with the social worker, the attorney, or the children's caretakers; and that she had no contact with the children's therapist. L.B.'s minimal efforts to contact DPHHS after termination proceedings had been initiated were not sufficient to show that she intended to resume the care of her children.

¶24 Accordingly, we hold that the District Court did not err when it terminated L.B.'s parental rights on the basis that she had abandoned her children.

¶25 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

Chief Justice Karla M. Gray specially concurring:

¶26 I agree with the Court's analysis of the abandonment issue before us and with the result reached. I write separately, as I have on previous occasions, to express concerns

with the conduct of DPHHS in this case. *See Matter of F.H.* (1994), 266 Mont. 36, 878 P.2d 890 (Gray, J., dissenting); *Inquiry into M.M.,* (1995), 274 Mont. 166, 906 P.2d 675 (Gray, J., dissenting). I also want to comment on several of the Court's statements.

¶27 The record reflects that L.B. contacted DPHHS on April 3, 2000, at which point the children had been in DPHHS' temporary legal custody, and in foster care, for over one year. On June 18, 2000, L.B. signed DPHHS' "Case Plan Recommendations" and was told she would need six months to complete the five recommendations. *Three days later,* DPHHS petitioned for permanent legal custody and termination of L.B.'s parental rights on the basis of abandonment.

¶28 Why in the world did DPHHS present the case plan which would take six months to complete on June 18 when it clearly intended to move quickly to terminate L.B.'s parental rights on abandonment grounds? Was it make-work for DPHHS personnel? Was it a "game" of some sort being played with L.B.? It strikes me that, whatever the reasons may have been, presenting the case plan under such circumstances was cruel and abusive to L.B., when there was no intent on DPHHS' part to give L.B. a real chance to complete the recommendations.

¶29 Nor do I agree with the Court's notion that the case plan, and L.B.'s failure to begin work on it prior to the hearing, "merely reinforces the [trial] court's conclusion that she abandoned the children." The Court joins DPHHS in characterizing L.B.'s argument that she was not given time to complete the case plan as "disingenuous" because she did not begin to work on the plan. What rational person would begin work on a plan designed to take six months when the petition to terminate her parental rights on the basis of abandonment was filed only three days later? Given the basis of the petition, it surely was clear to L.B., as it is to me, that any efforts on her part to work on the case plan would be futile and for naught. What kind of cruel hoax was being perpetrated on L.B., and why is it necessary or appropriate for this Court to join in it?

¶30 The law on abandonment as a basis for terminating a parent's rights is clear. The facts of this case with regard to abandonment are clear and clearly render the District Court's decision to terminate L.B.'s parental rights to J.J. and C.J. correct. For these reasons, notwithstanding my continuing concerns over DPHHS' conduct in some of the cases which come before us, I join the Court in affirming the District Court.

/S/ KARLA M. GRAY

Justice Terry N. Trieweiler specially concurring:

¶31 I join in Chief Justice Gray's specially concurring opinion.

/S/ TERRY N. TRIEWEILER