No. 01-886

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 293N

In Re the Matter of T.H. and C.D.F.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable John Larson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Hon. Mike McGrath, Attorney General, Helena, Montana

        Christine Killgore-Lannan, Special Assistant Attorney General, Helena, Montana

        Fred Van Valkenburg, County Attorney; Leslie Halligan, Deputy County Attorney, Missoula, Montana

    For Respondents:

        (No Respondents' briefs filed)

Submitted on Briefs: April 18, 2002

Decided:  December 12, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2    Child and Family Services Division (CFS) of the Department of Public Health & Human Services brought this action in District Court for the Fourth Judicial District in Missoula County to terminate the parental rights of D.H. (the natural mother of T.H. and C.D.F.), L.H. (the natural father of T.H.) and C.F. (the natural father of C.D.F.). The District Court entered findings of fact and conclusions of law, denying termination of L.H.'s parental rights and finding that CFS violated the Interstate Compact on the Placement of Children (ICPC), § 41-4-101, MCA, and ordered CFS to pay fees resulting from the illegal placement. CFS appeals the District Court's order. During the briefing phase of this appeal, L.H. submitted a waiver of parental rights to T.H. We reverse the judgment of the District Court.

¶3    There are two issues that remain to be decided on appeal:

¶4    1.  Did the District Court err when it found that L.H. had not abandoned T.H.?

¶5    2.  Did the District Court err when it concluded that CFS violated the ICPC?

FACTUAL AND PROCEDURAL BACKGROUND

2

¶6 D.H. is the natural mother of the two children in this case, T.H. and C.D.F. L.H. is the natural father of T.H., and C.F. is the natural father of C.D.F.

¶7 On March 6, 2000, D.H. and C.F. were arrested in Missoula for alleged possession of narcotics and drug paraphernalia. Police reports noted that drugs and paraphernalia, including syringes, were discovered in D.H.'s motel room and that T.H., who was six years old at that time, could access them. Three days later, D.H. gave birth to C.D.F., who was born opiate-addicted.

¶8 On March 16, 2000, CFS petitioned the District Court for temporary legal custody and the right to provide emergency protective services for T.H. and C.D.F. The court found the children in need of care, appointed a guardian ad litem for the children, appointed counsel for the parents, and set a show cause hearing before a special master for March 22, 2000. C.D.F. was placed with a foster family on March 20, 2000. T.H. was initially placed in a foster home, but was relocated to Watson Children's Shelter after demonstrating behavioral problems.

¶9 At the show cause hearing, the Special Master learned that J.H., T.H.'s maternal aunt who lived in Washington, was planning to petition for guardianship of T.H., and that the mother had consented to J.H.'s guardianship and custody of T.H. in Washington. The court placed T.H. in the custody of her aunt. CFS was ordered to continue its temporary investigative authority and to seek an expedited home study of the aunt in Washington. J.H. filed a petition for guardianship of T.H. in a separate proceeding. T.H.'s

3

mother stipulated to the guardianship and the petition was granted on April 10, 2000. After being ordered to do so by the court, CFS initiated proceedings pursuant to the ICPC on May 9, 2000.

¶10 On July 20, 2000, CFS filed a report regarding the mother's and C.F.'s chemical dependency evaluations. CFS requested the court to order a second chemical dependency evaluation, but no order to that effect was issued.

¶11 On July 17, 2000, District Judge Ed McLean extended the guardianship of T.H. and on July 21, 2000, the District Court in this case ordered that the case before Judge McLean be consolidated with this case, with District Judge John Larson presiding over both.

¶12 On August 3, 2000, the court-appointed special advocate (CASA) reported that the mother and C.F. were again arrested on July 21, 2000, for felony possession of drugs and drug paraphernalia, and for fraudulently obtaining prescription medication. The arrest resulted from a probationary search of their home which revealed several prescription bottles for narcotics, crushed or ground-up narcotic pills, and syringes. At least one of the prescriptions was obtained with use of a pseudonym and the narcotics were clearly not used as prescribed.

¶13 On August 23, 2000, the District Court issued an order that extended CFS' legal custody of T.H. and C.D.F., and modified the father of C.D.F.'s treatment plan to permit him a second chemical dependency evaluation. The court also approved CFS' proposed treatment plans for the mother and father of C.D.F.

4

¶14 On September, 12, 2000, CFS notified the court that the mother and father of C.D.F. had been arrested on new drug-related charges and that neither completed their chemical dependency evaluations as required by the approved treatment plans. The court again extended their treatment plans.

¶15 On November 28, 2000, the mother and father of C.D.F. withdrew from their outpatient chemical dependency treatment facilities and moved to Washington. They represented that they would enroll in an inpatient facility in Seattle. CFS directed the court's attention to the parts of the treatment plan that the mother and father of C.D.F. had failed to meet. On January 16, 2001, the District Court ordered CFS to petition for the termination of each parent's parental rights, and on February 7, 2001, CFS petitioned to terminate the parental rights of the mother and father of C.D.F. , and father of T.H.

¶16 After commencement of the termination proceedings on or about February 8, 2001, CFS located the father of T.H. at Kitsap County Jail in Washington, where he was then incarcerated. CFS served him with the petition to terminate his parental rights. He was released from jail on March 12, 2001, but did not appear at the hearing on the petition to terminate his parental rights on April 23 and April 24, 2001, nor did he otherwise participate in these proceedings until this appeal. CFS could not locate or personally serve the mother or father of C.D.F., and served the petition for termination of their parental rights by publication. At the hearing on the petition for termination, the mother and father of

C.D.F. did not personally appear. All three parents were represented by counsel at the hearing.

¶17 On August 2, 2001, and August 7, 2001, the District Court entered its findings of fact, conclusions of law, and orders in this case. The court denied termination of the parental rights of the mother and father of C.D.F. for failure to comply with a treatment plan, but did terminate their rights based on abandonment. The court denied termination of L.H.'s rights after concluding that CFS did not make "reasonable efforts" to contact L.H., provide a treatment plan for him, or otherwise encourage reunification. Neither did the court find sufficient evidence of abandonment by L.H. The court also found that CFS' placement of T.H. in Washington with her aunt violated the ICPC and ordered CFS to pay costs of the illegal placement.

¶18 During this appeal, no party filed a brief in opposition to CFS' opening brief or otherwise notified this Court of their position in this matter. On April 3, 2002, L.H.'s attorney filed a "Notice to the Court," which stated that she had not filed a brief because she was expecting a waiver of parental rights from L.H. She stated that in the past "several weeks" she had sent three sets of documents to L.H., one that he apparently did not receive, one that he returned without signing, and the third that she submitted along with the Notice. L.H.'s attorney informed this Court that L.H.'s signature on the waiver was not notarized because he has no photo identification, lives in a half-way house, and was unable to find a notary willing to notarize his signature. L.H.'s attorney

6

further explained that she could not notarize L.H.'s signature because she did not witness his signature in person, but that the signature on the waiver appears to be his when compared to a previous letter signed by him.

STANDARD OF REVIEW

¶19 When reviewing a district court's termination of parental rights, we determine "whether the court's findings of fact are clearly erroneous and whether the court's conclusions of law are correct." *In re J.J.*, 2001 MT 131, ¶ 14, 305 Mont. 431, ¶ 14, 28 P.3d 1076, ¶ 14. The court's findings of fact are clearly erroneous where they are not supported by substantial evidence, where the court misconstrues the effect of the evidence, or where review of the record convinces this Court that the District Court made a mistake. *J.J.*, ¶ 14.

DISCUSSION

ISSUE 1

¶20 Did the District Court err when it found that L.H. had not abandoned T.H.?

¶21 This matter comes to this Court in an unusual procedural posture. The District Court found and concluded that L.H. had not abandoned T.H. The State, through CFS, appealed. L.H. did not respond to the appeal but instead submitted a signed Waiver of Parental Rights, Relinquishment of Child and Consent to Adoption. The waiver was not notarized.

¶22 Section 42-2-408, MCA, sets forth the requirements for the valid execution of relinquishment and consent to adoption. Section 42-2-408(5), MCA, requires that "a relinquishment and consent to

7

adopt must be a separate instrument executed before a notary public."  L.H. does not fit within any noted exceptions to the notarization requirement.  *See* § 42-2-408(6), MCA (permits alternate method for members of the armed services and prisoners.)  Nor does his attorney offer authority for departing from the statutory requirements.

¶23  Therefore we conclude that L.H.'s waiver is not conclusive but may be considered with other information in the record that L.H. has abandoned T.H.  Section 41-3-609(1), MCA, provides that a court may terminate the parent-child legal relationship where it finds that the parents have relinquished the child pursuant to the provisions in §§ 42-2-402 and 42-2-412, MCA, or where "the child has been abandoned by the parents . . . ."  Section 41-3-102(1), MCA, defines "abandoned" as "*leaving a child under circumstances that make reasonable the belief that the parent does not intend to resume care of the child in the future* . . . ." (Emphasis added). We conclude that the record clearly demonstrates that L.H. has abandoned T.H. and that the District Court's finding to the contrary is clearly erroneous.  He has not meaningfully participated in these proceedings since he was personally served in February 2001; he has had limited telephonic contact with T.H. over the course of the proceedings, and has not otherwise fulfilled the parental role necessary for T.H.'s proper care; he has previously expressed a lack of interest in parenting T.H., unless the only other option was for T.H.'s mother to do so; and he has signed the written waiver submitted by his attorney in lieu of a brief.  We, therefore, reverse that part of the District Court's judgment which

8

held that T.H. had not been abandoned by her father, L.H., and remand to the District Court for entry of judgment terminating L.H.'s parental rights.

¶24  In spite of L.H.'s waiver and relinquishment of his parental rights, CFS requests that this Court consider the remaining issues raised by its appeal.  CFS contends that the actions complained of are "capable of repetition, yet evading review."

¶25  Issues of mootness must be resolved prior to addressing the underlying dispute.  *Grabow v. Montana High School Ass'n*, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14.  "A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy.  A question is moot when the court cannot grant effective relief."  *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, ¶ 19, 974 P.2d 1150, ¶ 19.

¶26  While there is no longer a controversy regarding several issues raised by CFS, we conclude that there remains a controversy regarding its alleged violation of the ICPC because it has been ordered to pay costs for doing so.  Therefore, we will address that one additional issue.

ISSUE 2

¶27  Did the District Court err when it concluded that CFS violated the ICPC?

¶28  The District Court concluded that CFS violated the ICPC, § 41-4-101, MCA, when it participated in the placement of T.H. in Washington with her aunt prior to notifying Washington and complying with their placement laws.  The District Court, in its

9

Order, ¶ 6, stated that "[t]he placement of [T.H.] violated Article III, §4 of the conditions for placement of ICPC set forth at § 41-4-101, et. seq., MCA (1999)." In ¶ 9 of its Order, the District Court ordered that "[t]he Court's Order of 3/22/00 in this cause as well as in Cause No. DG-00-40 which authorizes the placement in violation of ICPC is hereby invalidated and declared void." The court further ordered in ¶ 11 that "[a]s a consequence of the illegal placement, Montana CFS shall bear all necessary and appropriate costs which may be caused or result from that illegal placement."

¶29 CFS contends that the District Court erred because CFS was not responsible for the transfer of T.H. to her aunt in Washington, and that if there was any violation of the ICPC, it was the District Court that ordered the illegal placement. CFS contends that it should not be held financially responsible for the illegal placement. CFS also contends that the placement itself was not a placement within the provisions of the ICPC, and was therefore entirely legal.

¶30 The ICPC provides that "sending agencies" (such as CFS) shall not send or place a child into another state without complying with the requirements of the ICPC, which include providing prior notice to public authorities in the receiving state. *See* § 41-4-101, Art. III, MCA. It is not disputed that T.H. was moved to Washington to live with her aunt prior to compliance with the ICPC. Article VIII of the ICPC, however, provides:

    This compact shall not apply to:
    (1) the sending or bringing of a child into a receiving
    state by his parent, stepparent, grandparent, adult

10

> brother or sister, *adult* uncle or *aunt*, *or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state* . . . . [Emphasis added.]

Section 41-4-101, MCA. In its order on March 22, 2000, Brenda Desmond, a special master for the District Court ordered:

> [T.H.] shall be placed with [J.H.], her maternal aunt, pending further order of this Court. By this Order, [J.H.] shall have authority to transport [T.H.] to Washington State; and shall have full authority to make all necessary medical, educational, financial and any other decisions necessary to provide for the care and welfare of [T.H.].

The record shows that T.H. left the children's center with her aunt shortly after this order, moved with her aunt to Washington, and her aunt was appointed guardian shortly after on April 10, 2000. Based on these facts, we conclude that the District Court erred when it concluded that CFS violated the ICPC. The District Court-not CFS-authorized T.H.'s placement with her aunt and the ICPC restriction relied on to sanction CFS does not apply when children go to another state to live with an adult aunt. The placement of T.H. with her aunt was consistent-not inconsistent-with the authority that the District Court relied upon when it held that an ICPC violation had occurred. It states: "[p]lacements genuinely made between close relatives of the child are clearly outside the purview of the ICPC." SECRETARIAT TO THE ASSOCIATION OF ADMINISTRATORS OF THE INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN, THE INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN: A MANUAL AND INSTRUCTIONAL GUIDE FOR JUVENILE AND FAMILY COURT JUDGES 268 (1998). Therefore, we reverse that part of the District Court's conclusions of law and order that concluded CFS violated the ICPC and imposed costs against CFS for that violation.

11

¶31  This case is remanded to the District Court for entry of judgment consistent with this Opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM RICE